**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-7276

LYNEL WITHERSPOON,

Petitioner - Appellant,

v.

DONNIE STONEBREAKER, Warden of Evans Correctional Institution,

Respondent - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Anderson.  Henry M. Herlong, Jr., Senior District Judge.  (8:19-cv-00336-HMH)

Argued:  September 24, 2021                          Decided:  April 8, 2022

Before KING and RUSHING, Circuit Judges, and John A. GIBNEY, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Reversed and remanded by published opinion.  Judge King wrote the majority opinion, in which Senior Judge Gibney joined.  Judge Rushing wrote a dissenting opinion.

**ARGUED:**  Emily Washburn, Rohun Shah, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Tommy Evans, Jr., OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.  **ON BRIEF:**  John J. Korzen, Director, Rachel A. Klink, Third-Year Law Student, Alexandria K. Montgomery, Third-Year Law Student, Appellate Advocacy Clinic, WAKE FOREST UNIVERSITY SCHOOL OF LAW, Winston-Salem, North Carolina, for Appellant.  Alan Wilson, Attorney General, Donald J. Zelenka, Deputy

Attorney General, Melody J. Brown, Senior Assistant Deputy Attorney General, Caroline Scrantom, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.

—————————

KING, Circuit Judge:

This appeal arises from Lynel Witherspoon's nearly decade-long pursuit of relief from his 2013 conviction of a single count of cocaine distribution. Witherspoon was tried for that offense in the Court of General Sessions for Horry County, South Carolina (the "trial court"). The prosecution's evidence at trial was short of overwhelming, consisting principally of the testimony of an informant and a surveillance video she recorded during a controlled drug buy in a vehicle. The jury was initially unable to arrive at a verdict, and the trial court therefore ordered further deliberations. Shortly thereafter, the jury requested to view an enlarged, still frame from the informant's video, appearing to show the seller's face reflected in the vehicle's side-view mirror. Witherspoon's trial counsel did not object to that request, and the court granted it. The jury then requested that Witherspoon stand beside the enlarged image. The court inquired if Witherspoon's counsel had any objection, to which counsel replied, "I would, Your Honor, but . . . ." *See* J.A. 246.[1] The court interjected and directed Witherspoon to stand as the jury wished. The jury then resumed deliberations and, 10 minutes later, returned with a guilty verdict. Witherspoon was sentenced to 17 years of imprisonment.

Witherspoon subsequently pursued an unsuccessful direct appeal and, in 2014, filed an application for postconviction relief in the Court of Common Pleas for Horry County (the "PCR court"). In that proceeding, Witherspoon alleged that his trial counsel had

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

rendered ineffective assistance by failing to raise significant objections at trial, including an objection to the stand-up order. The PCR court denied relief in an abbreviated ruling, determining that, under *Strickland v. Washington*, 466 U.S. 668 (1984), Witherspoon's counsel "attempted to object at all appropriate times" and consequently was not "deficient in any way." *See Witherspoon v. State*, No. 2014-CP-26-8292, at 5 (S.C. Ct. Com. Pl. Mar. 7, 2016) (the "PCR Opinion"). The PCR court further ruled that, because there was no evidence that counsel's representation "was anything but professional and beneficial," there was no showing of prejudice. *Id.* Witherspoon sought appellate review, once more without success.

In 2019, Witherspoon brought these federal habeas corpus proceedings in the District of South Carolina pursuant to 28 U.S.C. § 2254, but the district court denied relief, concluding that the PCR court had not unreasonably applied the standards set forth in *Strickland*. Witherspoon timely noted an appeal to this Court, and we granted a certificate of appealability relative to his claim that his trial counsel was ineffective for failing to object to the stand-up order.

As explained herein, we conclude that Witherspoon's trial counsel's failure to object to the stand-up order constituted objectively deficient performance, that her performance prejudiced Witherspoon's defense, and that she thereby rendered constitutionally ineffective assistance. We also resolve that, in ruling to the contrary, the PCR court unreasonably applied the standards of *Strickland* to the facts of this case. Accordingly, we reverse the district court's judgment denying § 2254 relief and remand for the court to

award Witherspoon a writ of habeas corpus unless the State of South Carolina endeavors to prosecute him in a new trial within a reasonable time.

I.

A.

In August 2011, a South Carolina narcotics task force orchestrated a controlled drug buy in Horry County with a confidential informant, Jessica Stone. Stone represented that she was familiar with a drug dealer of interest to the task force, known to her as "Spoon." At the task force's direction, Stone arranged to purchase a quantity of crack cocaine from "Spoon" outside a Myrtle Beach apartment building. Investigators equipped a button in Stone's shirt with a small, forward-facing "button cam," searched her for drugs, and gave her $40 in marked bills to exchange for the cocaine. Stone's boyfriend then drove her to the site of the deal, followed closely behind by task force investigators.

Once in front of the apartment building, Stone made a phone call to "Spoon" from her vehicle's passenger seat. The investigators, positioned about 100 yards away, then witnessed a "Black male" approach Stone's vehicle. *See* J.A. 128. The man entered the vehicle's back seat on the right side, sitting directly behind Stone. Because of his positioning, the man's face was never directly recorded by Stone's "button cam." The man remained in the vehicle for several minutes, completed the transaction, and then left the area. Stone and her boyfriend drove to a prearranged meeting place, where Stone turned over to the investigators a bag of crack cocaine and her surveillance camera.

5

Evidently, the task force suspected Witherspoon of being the seller at the time of the controlled buy.[2]  He was not arrested for his alleged involvement in the transaction, however, until September 2012, some thirteen months later.  Following his arrest, Witherspoon was indicted by a Horry County grand jury with a single count of distribution of cocaine, in contravention of S.C. Code Ann. § 44-53-370(b)(1).  In July 2013, Witherspoon pleaded not guilty and proceeded to trial.

B.

Witherspoon's jury trial was conducted in the state trial court (the Court of General Sessions for Horry County) on July 24 and 25, 2013.  He was represented during that trial by a lawyer from the county public defender's office.  The prosecution's witnesses consisted largely of the involved narcotics investigators, alongside the confidential informant, Jessica Stone.  The task force's lead investigator testified that it was one of his colleagues who witnessed the crack cocaine seller enter Stone's vehicle, acknowledging that the observation was made from some distance.  Other investigators testified as to their interactions with Stone, as well as the sampling and chain of custody of the purchased cocaine.  Each member of the task force conceded that they were unable to witness the drug buy firsthand, and none were able to identify Witherspoon in the courtroom.  The prosecution did not elicit any testimony as to why no arrest was made at the scene of the crime, nor why Witherspoon was not apprehended until more than a year after the fact.

---

[2] At the beginning of the video recorded by Stone's "button cam," an agent states to the camera, "We're here.  This is a control buy for crack cocaine from — with a confidential informant with the suspect being Lynel Witherspoon." *See* J.A. 279.

6

For her part, Stone identified Witherspoon as the person she knew as "Spoon" and as the man she purchased the crack cocaine from during the 2011 controlled buy. During Stone's testimony, the prosecution played the video captured during the transaction by the "button cam." Stone acknowledged on cross-examination, however, that because of the camera's forward-facing orientation, it failed to capture the seller's face or any material parts of the drug handoff. She further explained that no investigators were present during the transaction or at the time she spoke with the seller over the phone. When confronted by Witherspoon's trial counsel, Stone admitted to having three prior felony convictions for forgery. Witherspoon's counsel ultimately inquired of Stone, "So, again, there is nothing else here to confirm the identity of anybody other than your say-so, you calling out a name; isn't that right?" *See* J.A. 196. Stone agreed: "Seems that way." *Id.* The prosecution rested following Stone's testimony. Witherspoon subsequently moved for a directed verdict, which motion the trial court denied. Witherspoon opted not to testify in his own defense.

The case was submitted to the jury at 3:53 p.m., and the jury returned with a series of questions during the afternoon. In response to queries as to why the seller was not arrested at the scene and why Witherspoon was not arrested until more than a year later, the trial court admonished the jury that "it would be highly improper to supplement the testimony during your deliberations. So I can only tell you that you must decide this case based on the evidence that has been given and the testimony that has been presented during the trial of the case, all right." *See* J.A. 229. As relevant to this appeal, the court's instruction was generally consistent with South Carolina precedent recognizing that

7

submitting evidence not admitted during trial to a jury during its deliberations unfairly prejudices the defendant, oftentimes entitling him to a new trial. *See, e.g.*, *State v. Hill*, 714 S.E.2d 879, 886, 888 (S.C. Ct. App. 2011). Ultimately, at 6:50 p.m. that evening, the jury indicated that it was unable to arrive at a unanimous decision. The court dismissed the jury for the day and resolved to issue an *Allen* charge in the morning.[3]

At 10:06 a.m. the following day, shortly after the trial court had given its *Allen* charge, the jury requested to again view the surveillance video recorded during the drug buy. More specifically, the jury asked to see a particular freeze-frame from that video, wherein the seller's face appeared to be reflected in the side-view mirror of Stone's vehicle. That freeze-frame had not been displayed, in and of itself, to the jury during trial — there, the "button cam" video was played without pause or alteration. At the court's direction, the prosecution presented the video on a projector screen, identified the desired frame, and, as Witherspoon's trial counsel later described, "manipulat[ed] it to try to blow it up," resulting in a "pix[e]lated" magnification. *See* J.A. 289-90. Once the image in question was presented, the jury asked if it could be "brightened any," and the court had the courtroom lights lowered. *Id.* at 245. Witherspoon's counsel did not lodge any objection during that process.

---

[3] An *Allen* or "dynamite" charge is an instruction given by a trial court urging, inter alia, reconsideration of the jury's position "when [the] jury has reached an impasse in its deliberations and is unable to reach a consensus." *See United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997) (citing *Allen v. United States*, 164 U.S. 492 (1896)).

The jury next indicated that it "would like the defendant to stand up and face us." *See* J.A. 245. At that point, the following exchange occurred between the court and Witherspoon's trial counsel:

THE COURT:                              Any objection?

WITHERSPOON'S COUNSEL:  I would, Your Honor, but . . .

THE COURT:                              I think that is appropriate. Please stand.
                                               Please stand.

*Id.* at 246.

Witherspoon then looked to his lawyer for instructions. In subsequent testimony, Witherspoon's trial counsel recounted that she was "thinking an explicative" at the time and that she "[could not] believe that the judge [was] making my client stand up next to a video, you know, next to a blow-up picture from a side-view mirror picture from the video." *See* J.A. 292. Nonetheless, counsel told Witherspoon that he had to stand as directed — as she later stated, "he stands up, and that is that." *Id.* After observing Witherspoon next to the freeze-frame, the jury resumed deliberations at 10:24 a.m. Ten minutes later, at 10:34 a.m., the jury returned with a unanimous verdict, finding Witherspoon guilty of the cocaine distribution charge. Witherspoon declined to address the court, and the court promptly sentenced him to 17 years of imprisonment.

C.

1.

Following his conviction, Witherspoon initiated what would become a protracted endeavor to obtain relief, to be overseen by an extensive cast of lawyers. First,

Witherspoon turned to the South Carolina Court of Appeals, where he was again represented by a lawyer with the public defender's office. Witherspoon's appellate lawyer, however, filed an *Anders* brief, and did not raise any challenge to the trial court's stand-up order but asserted only that the court erred by failing to enter a directed verdict.[4] In accord with *Anders*, Witherspoon's appellate lawyer moved to be relieved as counsel, citing a lack of meritorious issues to be raised on direct appeal. Witherspoon then filed a pro se brief further contesting the trial court's jury instructions and *Allen* charge. In October 2014, the state court of appeals dismissed the matter after conducting an *Anders* review and granted appellate counsel's motion to be relieved. Witherspoon petitioned the Supreme Court of South Carolina for a writ of certiorari, but that court too turned him away, explaining that it denies certiorari as a matter of course when the state court of appeals dismisses an appeal upon an *Anders* review. At that stage, Witherspoon had exhausted his options for a direct appeal in the South Carolina courts.

---

[4] An *Anders* brief takes its name from the Supreme Court's decision in *Anders v. California*, 386 U.S. 738 (1967). Pursuant thereto, a lawyer who concludes that an appeal on behalf of his criminal defendant client would be "wholly frivolous" should advise the appellate court as such and file a request to withdraw from representation, along with "a brief referring to anything in the record that might arguably support the appeal." *Id.* at 744. The defendant may then file a pro se brief, and the court must conduct its own "full examination of all the proceedings" to determine whether the appeal is indeed "wholly frivolous." *Id.*

2.

a.

Initially proceeding pro se, Witherspoon next filed his application for postconviction relief in the state PCR court (the Court of Common Pleas for Horry County). In that proceeding, which is at the root of this appeal, Witherspoon attacked his conviction on grounds including ineffective assistance of his trial counsel. Witherspoon was again appointed representation for the PCR court hearing of February 9, 2016. There, the appointed lawyer developed Witherspoon's ineffective assistance claim into four discrete claims. He maintained that trial counsel violated her Sixth Amendment duty by failing to (1) move to suppress the "button cam" surveillance video; (2) move to suppress or object to the lead narcotics investigator's purported hearsay testimony; (3) object to the trial court's *Allen* charge; and (4) object to either the display of the video freeze-frame or the court's subsequent stand-up order.

Witherspoon's trial counsel testified at the PCR court hearing, which focused solely on the ineffective assistance allegations against her. Trial counsel explained, in pertinent part, that although she was "appalled" by the prosecutor's display and "blowing up" of the surveillance video freeze-frame, she elected not to object to that demonstration itself because the video was already in evidence. *See* J.A. 289-90. With respect to the court's order for Witherspoon to stand next to the display, counsel testified that she "was trying to object or some version of that, but I don't think I objected strenuous enough or clear enough, because I was very unhappy with the judge making my guy stand up beside the video." *Id.* at 290.

11

When questioned on direct examination, Witherspoon's trial counsel agreed that the prosecution's display of the freeze-frame presented the jury with "a different depiction of the evidence," even prior to Witherspoon's being made to stand next to the image. *See* J.A. 291. In response to an inquiry as to whether she had in fact objected to the court's stand-up order, trial counsel stated, "Apparently my statement was cut off" and "apparently I didn't get much out." *Id.* at 291-92. She elaborated that "I think that the decision was made when the jury requested it, but I did attempt to object." *Id.* at 292.

On cross-examination, Witherspoon's trial counsel suggested that she actually succeeded in objecting to the stand-up order, saying that she "[a]pparently" did object. *See* J.A. 299. She also referred to that moment in the trial, however, as "my major regret here." *Id.* Addressing her silence upon the trial court's directive for Witherspoon to stand, trial counsel agreed with her cross-examiner that "once a judge makes up his mind, you have to roll with it." *Id.* But she then acknowledged her duty "to defend my client and his rights" and the possibility that she thus should have lodged "a more insistent objection." *Id.* As trial counsel put it, "I think that maybe I should have just taken the hit and . . . put it all out there . . . because ultimately that is my job." *Id.*

b.

By its PCR Opinion of March 7, 2016, the PCR court denied Witherspoon's application for relief. In so doing, the court set forth the standards governing ineffective assistance claims under *Strickland v. Washington*, 466 U.S. 668 (1984). Specifically, the court explained that *Strickland*'s "two-pronged test" required Witherspoon to show, first, that "trial counsel's performance was deficient" and, second, that "counsel's deficient

12

performance . . . prejudiced [Witherspoon] such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *See* PCR Opinion 4-5 (quoting *Strickland*, 466 U.S. at 694).

The PCR court then disposed of Witherspoon's four claims of ineffective assistance of trial counsel in a catch-all determination. In analyzing *Strickland*'s performance prong, the court generally found that Witherspoon's trial counsel "had a valid and clearly articulable trial strategy that was in line with the prevailing norms of professional conduct." *See* PCR Opinion 5. The court premised that finding on trial counsel's "very credible . . . testimony regarding her trial strategy and how she was prepared to handle different elements of the evidence and witnesses at trial." *Id.* As pertinent to this appeal, the court further credited counsel's "persuasive and credible . . . testimony that she attempted to object at all appropriate times." *Id.* That is, the court found — consistent with counsel's testimony on direct examination — that counsel merely "attempted to object" to the stand-up order. Nevertheless, the court concluded that Witherspoon failed "to demonstrate trial counsel was ineffective in any manner" or "deficient in any way." *Id.*

In assessing *Strickland*'s prejudice prong, the PCR court simply related that, "assuming *arguendo* that deficiency had been proven, [Witherspoon] failed to prove that he was in any way prejudiced by trial counsel's representation." *See* PCR Opinion 5. That was because Witherspoon "presented no evidence of trial counsel representing him in a manner that was anything but professional and beneficial." *Id.* Despite having recited the *Strickland* standard for measuring prejudice — whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

13

different," *see Strickland*, 466 U.S. at 694 — the court did not undertake any analysis of the likelihood of a different trial result if Witherspoon's counsel had objected to the stand-up order.

c.

Witherspoon again sought review by the Supreme Court of South Carolina, at which time yet another lawyer was appointed to handle his appeal. Witherspoon's new appellate attorney argued that the PCR court had erred in its *Strickland* analysis by failing to find trial counsel ineffective for not objecting to the freeze-frame display or the stand-up order. Like his counsel on direct appeal, however, Witherspoon's new appellate lawyer ultimately petitioned to be relieved from her role — she filed with the state supreme court a *Johnson* brief, a South Carolina analogue to an *Anders* brief.[5]

Witherspoon then filed a handwritten pro se brief in the Supreme Court of South Carolina on November 16, 2016, raising numerous contentions of error by both the trial and PCR courts. With respect to his claim that the PCR court erred in not finding his trial counsel ineffective for her handling of the stand-up procedure, Witherspoon averred that "[a]n objection is said to be a formal statement opposing something that has occurred." *See* J.A. 404. For that proposition, Witherspoon relied on *State v. Byers*, 710 S.E.2d 55, 58 (S.C. 2011), which held that for an in-court objection to be preserved for appellate review, it must be made "with sufficient specificity to inform the circuit court judge of the

---

[5] In a *Johnson* brief, appellate counsel proclaims there are no meritorious issues that can be raised in a South Carolina postconviction relief appeal. *See Johnson v. State*, 364 S.E.2d 201 (S.C. 1988).

14

point being urged by the objector." Witherspoon maintained that his trial counsel's statement of "I would, Your Honor, but . . ." could not be read to "sufficiently specify anything," considering that "the word 'but,' means, 'on the contrary' or shows contrast or [is] used to negate which means, to make ineffective." *See* J.A. 404. The state supreme court then transferred Witherspoon's case to the South Carolina Court of Appeals pursuant to a local procedural rule. In April 2018, after reviewing the record and considering the appellate lawyer's *Johnson* brief, that court denied certiorari.

3.

In February 2019, faced with no further options in the South Carolina state courts, Witherspoon filed in the District of South Carolina the 28 U.S.C. § 2254 petition for habeas corpus relief at issue in this appeal.[6] Section 2254 generally requires that, for a district court to grant a writ of habeas corpus, the court must determine that the state court adjudication of the applicant's claim resulted in a decision "contrary to" or "involv[ing] an unreasonable application of" clearly established federal law, or a decision "based on an unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d)(1)-(2).

Witherspoon's § 2254 petition was prepared and briefed by his fifth lawyer. That petition presented the federal district court with fundamentally the same four claims of

---

[6] By virtue of having pursued all options for relief available to him in the South Carolina courts, both on direct appeal and in seeking postconviction relief, Witherspoon satisfied § 2254's procedural exhaustion conditions. Those conditions require an applicant to have "exhausted the remedies available in the courts of the State," which will not be the case unless and until "he has [no] right under the law of the State to raise, by any available procedure, the question presented." *See* 28 U.S.C. § 2254(b)(1)(A), (c).

15

ineffective assistance of trial counsel that had been argued in the state PCR court, alleging ineffective assistance of Witherspoon's trial counsel for failure to move to suppress or object to (1) the "button cam" video; (2) the investigator's testimony; (3) the trial court's *Allen* charge; and (4) the stand-up order.[7]  As part of those claims, the petition advanced new contentions that trial counsel rendered ineffective assistance by failing to move for a mistrial after the trial court gave the jury the *Allen* charge and issued the stand-up order. Witherspoon's habeas corpus proceedings were initiated against respondent Donnie Stonebreaker, warden of the Evans Correctional Institution in South Carolina, where Witherspoon was and remains in confinement.  We refer herein to the respondent as the "State."

The State answered Witherspoon's § 2254 petition and moved for summary judgment.  In support of its motion, the State first asserted that the PCR court had not specifically ruled on each of Witherspoon's claims for relief, rendering them procedurally defaulted.  On the merits, the State maintained that the PCR court's application of *Strickland* to the facts of Witherspoon's claims passed muster under the standards of § 2254(d), such that no relief was warranted.

In July 2019, the magistrate judge issued a report and recommendation, advising the district court to deny Witherspoon's § 2254 petition and to grant the State's motion for summary judgment.  *See Witherspoon v. Stonebreaker*, No. 8:19-cv-00336 (D.S.C. July

---

[7] Witherspoon did not contend in his § 2254 petition that his trial counsel was ineffective by reason of failing to object to the video freeze-frame display.

16

11, 2019), ECF No. 14 (the "Report and Recommendation"). Because the PCR court had not ruled on Witherspoon's claims concerning his trial counsel's failure to move for a mistrial, the Report and Recommendation found those contentions to be procedurally defaulted. It went on to determine that although the remaining four claims were not so defaulted, those claims failed on the merits because Witherspoon could not demonstrate that the PCR court's decision was contrary to or involved an unreasonable application of *Strickland*, or that the decision was based on an unreasonable determination of the facts.

Relative to Witherspoon's claim pertaining to his trial counsel's failure to object to the stand-up order, the magistrate judge acknowledged the PCR court's finding that trial counsel had "attempted to object." *See* Report and Recommendation 32. Thereafter, however, the Report and Recommendation treated counsel's mere attempt to object as a successful objection. According to the Report and Recommendation, counsel "objected to having [Witherspoon] stand next to the image on the screen, and [Witherspoon] has failed to direct this Court to any legal authority to support his argument that trial counsel should have handled the objection differently." *Id.* at 35. Relying on the premise that Witherspoon's trial counsel had successfully objected to the stand-up order, the Report and Recommendation then advocated granting the State's summary judgment motion on the pertinent ineffective assistance claim.

Witherspoon filed objections to the Report and Recommendation, highlighting that the PCR court had found that his trial counsel only attempted to object to the stand-up order. *See Witherspoon v. Stonebreaker*, No. 8:19-cv-00336 (D.S.C. July 25, 2019), ECF No. 15. In Witherspoon's words, the PCR court acted unreasonably in that it "completely

17

disregarded [a] fundamental principle of constitutionally effective representation" in concluding "that counsel's '*attempt[s]* to object at all appropriate times' were sufficient for the purposes of *Strickland*." *Id.* at 8. Witherspoon protested that "[i]f a PCR court is willing to excuse counsel's failure to raise issues at trial, the proceeding ceases to have any value for the applicant." *Id.*

By its opinion and order of August 12, 2019, the district court adopted the Report and Recommendation over Witherspoon's objections. *See Witherspoon v. Stonebreaker*, No. 8:19-cv-00336 (D.S.C. Aug. 12, 2019), ECF No. 17 (the "Habeas Opinion"). Consistent with the Report and Recommendation — and contrary to the PCR Opinion — the Habeas Opinion accepted that Witherspoon's trial counsel had successfully objected to the stand-up order. After characterizing trial counsel's PCR testimony as indicating "that she objected to . . . the in-court stand up procedure," *id.* at 8-9, the Habeas Opinion pronounced, "[b]ased on the record," that counsel "objected to the issues identified in [Witherspoon's ineffective assistance claims]," *id.* at 10. From there, the district court concluded that "the PCR court did not unreasonably analyze the facts regarding Witherspoon's claims." *Id.* Accordingly, the district court denied Witherspoon's § 2254 habeas corpus petition, granted summary judgment to the State, and denied a certificate of appealability.

On September 6, 2019, Witherspoon timely filed a pro se notice of appeal of the district court's judgment in the § 2254 proceedings. We granted a certificate of appealability in August 2020 solely as to Witherspoon's fourth claim for habeas corpus relief, on the question of whether the PCR court unreasonably applied *Strickland* in

18

concluding that Witherspoon's trial counsel did not render ineffective assistance by failing to object to the stand-up order. Witherspoon was then appointed counsel for this appeal, and we possess jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.[8]

## II.

Under 28 U.S.C. § 2254, a state prisoner may petition a federal court for a writ of habeas corpus, provided the petitioner contends that he is in custody in violation of the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a). Following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), however, a federal court may not grant § 2254 relief with respect to any claim adjudicated on the merits in state court unless the underlying state adjudication:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See* 28 U.S.C. § 2254(d). Significantly, AEDPA further directs that state court factual determinations are presumed to be correct and that the presumption of correctness is rebuttable only by clear and convincing evidence. *Id.* § 2254(e)(1).

---

[8] Contemporaneous with our order of August 7, 2020, granting a certificate of appealability in this matter, we appointed Professor John Korzen and third-year law students of the Wake Forest University School of Law Appellate Advocacy Clinic to represent Witherspoon. Witherspoon's counsel have performed admirably in these proceedings, and we appreciate their fine service.

Our review of a district court's denial of a state prisoner's § 2254 petition is de novo, conducted on the basis of the state court record. *See Tucker v. Ozmint*, 350 F.3d 433, 438 (4th Cir. 2003). AEDPA places a heavy burden on § 2254 habeas corpus petitioners and provides for a "highly deferential standard for evaluating state-court rulings, . . . demand[ing] that state-court decisions be given the benefit of the doubt." *See Tyler v. Hooks*, 945 F.3d 159, 165-66 (4th Cir. 2019) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). Under § 2254(d)(1), a state court's decision will involve an "unreasonable application" of federal law only where the court "identified the correct governing legal principles . . . but unreasonably applied those principles to the facts of [the prisoner's] case." *See Elmore v. Ozmint*, 661 F.3d 783, 851 (4th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). Habeas corpus relief is not to be granted simply because the reviewing federal court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *See Williams*, 529 U.S. at 411. The "reasonableness" inquiry turns on whether "fairminded jurists could disagree" that the state court decision was correctly rendered. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). An award of relief is appropriate only in instances where the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

In the context of § 2254(d)(1), "clearly established Federal law" refers to governing legal principles set forth by the Supreme Court at the time the state court rendered its

20

decision. *See Elmore*, 661 F.3d at 850. In these proceedings, such principles are drawn from the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the Court elaborated on its longstanding recognition that the Sixth Amendment right to counsel "is the right to the effective assistance of counsel." *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970)). *Strickland* set forth a two-prong standard that must be satisfied for a convicted defendant to prevail on an ineffective assistance of counsel claim: the defendant must demonstrate that (1) his counsel's performance was deficient and (2) such deficient performance prejudiced his defense. *Id.* at 687. A sufficient showing on both points evinces "a breakdown in the adversary process that renders the result unreliable." *Id.*

*Strickland*'s first prong — deficient performance — demands a showing that "counsel's representation fell below an objective standard of reasonableness," taking into account "prevailing professional norms" and whether "the challenged action might be considered sound trial strategy." *See Strickland*, 466 U.S. at 688-89 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Scrutiny of counsel's performance is to be highly deferential, so as to afford counsel latitude in making strategic decisions, though "not every purported 'strategic reason' will do." *See United States v. Allmendinger*, 894 F.3d 121, 129 (4th Cir. 2018). As to the second prong — prejudice — the defendant is required to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. Such a "reasonable probability" of a change in result is one that is "sufficient to undermine

21

confidence in the outcome." *See Tice v. Johnson*, 647 F.3d 87, 102-03 (4th Cir. 2011) (quoting *Strickland*, 466 U.S. at 694).

Where, as here, a § 2254 petition alleges ineffective assistance of counsel as a basis for relief, the reviewing federal court must assess the claim "through the dual lens of the AEDPA standard and the standard set forth by . . . *Strickland*." *See Valentino v. Clarke*, 972 F.3d 560, 579 (4th Cir. 2020). That is, our review in such a case is best characterized as "doubly" deferential, requiring us to consider "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *See Harrington*, 562 U.S. at 105; *see also Moore v. Hardee*, 723 F.3d 488, 496 (4th Cir. 2013).

III.

Despite the markedly deferential standard of review compelled by AEDPA, we must conclude that Witherspoon is entitled to habeas corpus relief under 28 U.S.C. § 2254 on the Sixth Amendment ineffective assistance of counsel claim now before us — the claim that his trial counsel was ineffective in failing to object to the trial court's stand-up order. Our consideration of the factual backdrop presented to the state PCR court leads us to the inescapable conclusion that the court unreasonably applied the governing legal standards from *Strickland v. Washington*, 466 U.S. 668 (1984), in ruling that Witherspoon's counsel's handling of the stand-up issue was not ineffective. We accordingly resolve that the district court erred in its approval of the PCR court's disposition of that claim.

22

A.

As explained above, in analyzing *Strickland*'s performance prong, the PCR court credited Witherspoon's trial counsel's testimony that she merely "attempted to object" to the stand-up order and at all other appropriate times. *See* PCR Opinion 5. Although the district court proceeded on the premise that trial counsel successfully objected to the stand-up order, the PCR court found to the contrary and nonetheless ruled that counsel was not "ineffective in any manner" or "deficient in any way." *See id.* We conclude that the PCR court unreasonably applied *Strickland* to the facts of Witherspoon's case in deciding that trial counsel's performance was not deficient. Simply put, trial counsel cannot be found to have operated within the admittedly broad scope of *Strickland*'s measure of competence when she only attempted — and thereby failed — to object to the stand-up order.

1.

In our review of the PCR court's ruling, we abide by the court's finding that Witherspoon's trial counsel merely "attempted to object" to the stand-up order. And we do so in rejection of the State's efforts to have us accept, as the district court did, that counsel actually objected successfully. As we must under AEDPA, we presume the PCR court's factual determination to be correct in the absence of clear and convincing evidence to rebut that presumption. *See* 28 U.S.C. § 2254(e)(1). We also observe that, in concluding that trial counsel did in fact object, the district court disregarded AEDPA's deferential standard.

First of all, the PCR court's finding that Witherspoon's trial counsel "attempted to object" cannot be interpreted as a finding that she actually objected. An attempted

23

objection is not the same as the real thing — just as, for instance, an attempt to swim the width of a river is not the same as reaching the opposite bank. Furthermore, the PCR court's determination that trial counsel made only an attempted objection, and thus failed to make an actual one, is supported by the record. Counsel's response to the trial court's inquiry as to whether she objected to the jury's request to have Witherspoon stand — "I would, Your Honor, but . . ." — turned on the conditional term "but," suggesting that counsel "would" have objected but for some unspoken matter that informed her decision not to challenge the jury's request. As Witherspoon himself aptly stated in his pro se appeal from the PCR Opinion, "the word 'but,' means, 'on the contrary' or shows contrast or [is] used to negate which means, to make ineffective." *See* J.A. 404. The plain meaning of counsel's response to the trial court's inquiry, then, confirms that her statement was far afield from an outright objection.

The proposition that Witherspoon's trial counsel failed to object to the stand-up order also finds support in South Carolina law. The South Carolina Rules of Evidence provide that preserving an issue for appeal requires the lawyer to timely object, state her "specific ground of objection," and obtain a ruling on that objection. *See* S.C. R. Evid. 103(a)(1). The decisions of the Supreme Court of South Carolina are to the same effect. *See, e.g.*, *State v. Byers*, 710 S.E.2d 55, 58 (S.C. 2011) ("For an objection to be preserved for appellate review, [it] must be made . . . with sufficient specificity to inform the circuit court judge of the point being urged by the objector." (citations omitted)); *State v. Prioleau*, 548 S.E.2d 213, 216 (S.C. 2001) ("[A]n objection should be sufficiently specific to bring into focus the precise nature of the alleged error so it can be reasonably understood by the

24

trial judge."); *Wilder Corp. v. Wilke*, 497 S.E.2d 731, 733 (S.C. 1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge . . . ."). Here, trial counsel's response to the stand-up order cannot be interpreted as having set forth a "specific ground of objection" or having "br[ought] into focus the precise nature of the alleged error," and the record does not suggest that any objection was actually raised and ruled upon by the trial court. In these circumstances, the state PCR court's determination that trial counsel attempted, but failed, to object to the stand-up order is unassailable.

2.

There also can be no dispute that any reasonable lawyer would have objected to the trial court's order for Witherspoon to stand next to the video freeze-frame, a procedure that presented the jury with new, material evidence following the close of the trial evidence. South Carolina law makes clear that evidence submitted to a jury during its deliberations — and not introduced at trial — is unfairly prejudicial to the defendant, and absent a curative instruction, granting the defendant a new trial is the appropriate remedy for such error. *See State v. Hill*, 714 S.E.2d 879, 886, 888 (S.C. Ct. App. 2011) (citing *State v. Rogers*, 80 S.E. 620, 621 (S.C. 1914)); *accord United States v. Lentz*, 383 F.3d 191, 219 (4th Cir. 2004) ("If prejudicial evidence that was not introduced at trial comes before the jury, the defendant is entitled to a new trial." (quoting *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984))). By the same token, any evidentiary presentation that is made during jury deliberations must "mirror[] the way in which the evidence was presented at trial." *See State v. Winkler*, 698 S.E.2d 596, 602 (S.C. 2010).

25

Plainly, Witherspoon's trial counsel possessed a well-founded basis for objecting to the stand-up order. Trial counsel conceded in her PCR testimony that the video freeze-frame alone was "a different depiction of the evidence," *see* J.A. 291, and with Witherspoon beside the freeze-frame, the stand-up display certainly did not "mirror" the display of the surveillance video during trial. Yet not only did counsel fail to lodge an objection when asked by the trial court if she objected to the jury's stand-up request, she actually sat silent when the trial court thereafter directed her client to "[p]lease stand." *Id.* at 246. Counsel did not request to approach the bench, nor did she seek to discuss the stand-up issue with the court outside of the jury's presence. Instead, she simply demurred and opted to "roll with it." *Id.* at 299.

It is notable that, even if Witherspoon's trial counsel was not previously aware of the relevant principles of South Carolina law, she was put on notice of them when the trial court responded to the jury's initial requests for additional information. In a firm rebuke explaining that consideration of supplementary evidence during deliberations would be inappropriate, the trial court advised the jury that

> it would be highly improper to supplement the testimony during your deliberations. So I can only tell you that you must decide this case based on the evidence that has been given and the testimony that has been presented during the trial of the case, all right.

*See* J.A. 229. Following that admonishment, it was surely apparent that the jury was not to be presented with "supplemental" information amid its deliberations.

Moreover, the gravity of the stand-up order presented Witherspoon's trial counsel with every reason to make a swift and unequivocal objection. In brief, the prosecution's

26

case against Witherspoon was relatively thin at the close of the evidence. At that stage, Witherspoon's counsel had successfully impeached the credibility of the prosecution's informant by way of her admission to her prior felony convictions for forgery. Witherspoon's counsel had also established that the informant's "button cam" video failed to capture any part of the crack cocaine transaction or a direct view of the seller's face. The prosecution, then, was hard pressed to meet its burden of proving Witherspoon's guilt. And indeed, the trial court had been compelled to give an *Allen* charge because the jury had found itself deadlocked.

It is accordingly evident that lodging a proper objection to the trial court's stand-up order — in an effort to shield Witherspoon from new and potentially incriminatory evidence, to protect his interests, and to preserve a compelling issue for appeal that would likely entitle him to a new trial if the objection were overruled — was necessary to afford proficient, effective assistance. *Cf. Haskins v. Fairfield Elec. Coop.*, 321 S.E.2d 185, 191 (S.C. Ct. App. 1984) ("Where a ruling on an objection is not made by the trial judge and counsel does not pursue a ruling, there is no decision by the trial judge for this court to review."), *overruled on other grounds by O'Neal v. Bowles*, 431 S.E.2d 555 (S.C. 1993). Conversely, Witherspoon's trial counsel's failure to so object was out of line with the performance of the capable criminal defense lawyer contemplated by *Strickland*.

Importantly, trial counsel's failure to object to the stand-up order cannot, under *Strickland*, be defended as adequate performance rooted in some "sound trial strategy" consistent with "prevailing professional norms." *See Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Although the PCR court found that

27

Witherspoon's counsel "had a valid and clearly articulable trial strategy that was in line with the prevailing norms of professional conduct," the court made no effort to explain how trial counsel's handling of the stand-up order was in furtherance of a sensible strategy and in line with what a reasonable professional would do under the circumstances. *See* PCR Opinion 5. To be sure, we are obliged to presume that counsel's conduct was within the "wide range" of what can constitute reasonably competent assistance. *See Strickland*, 466 U.S. at 689-90. That presumption, however, cannot stand in these circumstances. If there is some "sound trial strategy" in yielding to the presentation of new evidence during jury deliberations that is patently injurious to one's own client, or some "prevailing professional norm" counseling as much, it has not been brought to our attention.

It may be argued that in refraining from making further efforts to prohibit the stand-up procedure, Witherspoon's trial counsel sought to avoid a sparring match with the judge or retaliation for questioning the court's orders. An attorney's obligations are owed chiefly to her client, however, and there is no reasonable argument to be made that by remaining silent, trial counsel served Witherspoon's interests more so than she would have by objecting to the stand-up order. As counsel later acknowledged, "I have to defend my client and his rights, and I think that maybe I should have just taken the hit." *See* J.A. 299. Prevailing professional norms call for zealous representation of the client at all stages of a criminal trial, for keeping incriminating evidence from the jury's eye to the best of counsel's ability, and for ensuring that meritorious issues are preserved for appellate review. Counsel's failure to object to the stand-up order did not comport with those norms.

28

3.

Of course, our task in this appeal is not simply to weigh the merits of Witherspoon's claim of ineffective assistance, but to scrutinize the PCR court's application of *Strickland* in rejecting that claim. Here, we are compelled to conclude that the PCR court's determination that Witherspoon's trial counsel's performance was not "deficient in any way," *see* PCR Opinion 5, as though there were no real question on the matter, amounts to a patently unreasonable application of *Strickland* that is well within the ambit of § 2254(d)(1). We are unable to discern how the court concluded, on the one hand, that trial counsel did not object to the stand-up order and that, at the same time, she rendered performance satisfying *Strickland*'s standard. Indeed, neither the PCR court in its opinion nor the State in its arguments before this Court have been able to explain how trial counsel's response to the stand-up issue might be accredited to a sound trial strategy or defended on grounds of a norm routinely kept in the legal profession. For that reason, we conclude that the PCR court's analysis of *Strickland*'s performance prong lacked reason and reflects error "beyond any possibility for fairminded disagreement." *See Harrington v. Richter*, 562 U.S. 86, 103 (2011).[9]

---

[9] We observe that, if Witherspoon's trial counsel's statement to the trial court could be construed as a bona fide objection, our conclusion that her response to the stand-up order was constitutionally deficient under *Strickland* would not change. Such is the case because Witherspoon's counsel left the trial record in a state suggesting she did not object and that the stand-up issue had not been preserved for consideration on appeal. We are confident that a reasonable defense attorney in the same circumstances would have made her objection plain and unmistakable. Trial counsel's failure to do as much is well illustrated by the fact that on direct appeal, Witherspoon's first appellate lawyer filed an *Anders* brief and did not contest the propriety of the stand-up order. Thereafter, in its *Anders* review, (Continued)

B.

Although the PCR court concluded that Witherspoon's trial counsel's performance was not deficient, the court proceeded to *Strickland*'s prejudice prong. Specifically, the court ruled that — "assuming *arguendo* that deficiency had been proven" — Witherspoon "failed to prove that he was in any way prejudiced by trial counsel's representation." *See* PCR Opinion 5. We conclude that the court unreasonably departed from *Strickland* in arriving at that ruling. Critically, *Strickland* provides that, for a defendant to demonstrate that his counsel's deficient performance prejudiced his defense, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See* 466 U.S. at 694. The PCR court, however, applied some wholly different test. Assessing Witherspoon's ineffective assistance claim under the *Strickland* standard, as is proper, it is beyond dispute that trial counsel's failure to object to the stand-up order prejudiced Witherspoon's defense.

1.

Pursuant to AEDPA, an "unreasonable application" of clearly established federal law occurs where the state court decision "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *See Williams v. Taylor*, 529 U.S. 362, 413 (2000). In this situation,

---

the South Carolina Court of Appeals failed to identify the stand-up order as a preserved and non-frivolous issue. As such, we perceive no basis on which to conclude that trial counsel's response to the stand-up order satisfied *Strickland*'s standard for effective representation.

30

the PCR court had initially identified the applicable legal principle from *Strickland*: prior to disposing of Witherspoon's claims for ineffective assistance, the court recited the above-stated "reasonable probability" standard. *See* PCR Opinion 4-5. In its subsequent consideration of the prejudice question, however, the court shifted to the application of a test seemingly of its own design. The court's prejudice analysis proceeded as follows:

> [Witherspoon] failed to prove that he was in any way prejudiced by trial counsel's representation. [Witherspoon] presented no evidence of trial counsel representing him in a manner that was anything but professional and beneficial. Therefore, had this matter reached the second prong of the [*Strickland*] test, [Witherspoon] could not have proven that he was prejudiced by trial counsel's ineffective performance.

*See* PCR Opinion 5.

Thus, the PCR court's prejudice analysis reflects an unreasonable application of *Strickland*, in that the court simply ignored the rule of that decision. It afforded no evident consideration to whether Witherspoon's trial counsel's mere "attempted" objection might have influenced the outcome of Witherspoon's trial, instead finding that counsel's service was "professional and beneficial," and "therefore" no prejudice was done to Witherspoon's defense. Such is not the Supreme Court's formulation of the prejudice inquiry, and the PCR court's analysis on that question consequently cannot be characterized as anything less than an unreasonable application of *Strickland*, perhaps even one that is "contrary to" the clearly established federal law set forth by the Court therein. *See Williams*, 529 U.S. at 413 (explaining that, under the § 2254(d)(1) "'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law").

31

2.

Applying the *Strickland* prejudice standard results in only one reasonable conclusion: there is a reasonable probability that, but for Witherspoon's trial counsel's failure to object to the stand-up order, the result of Witherspoon's trial would have been different. Prior to the stand-up order, the jury — equipped only with Jessica Stone's impeached testimony and the "button cam" video footage — was unable to arrive at a verdict, repeatedly requesting further information and eventually prompting the trial court to give an *Allen* charge. After it was permitted to study Witherspoon next to the video freeze-frame, however, the jury not only returned a unanimous guilty verdict, but did so in no less than 10 minutes.

In consideration of that prompt about-face, we fail to see how Witherspoon's trial counsel's failure to object to the stand-up order would not be read as having prejudiced Witherspoon's defense. That is, there is at least a "reasonable probability" that had trial counsel endeavored to stop the stand-up by objecting to the trial court's order and explaining the well-founded basis for her protest, the jury would not have observed Witherspoon beside the freeze-frame and would not have returned a guilty verdict, such that "the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694-95 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.").

Once again, AEDPA ultimately charges us with deciding whether there is any reasonable justification for the PCR court's ruling that trial counsel's performance did not

32

prejudice Witherspoon "in any way." *See* PCR Opinion 5. We do not hesitate to conclude

that there can be no such justification. We are confident that no "fairminded jurists could

disagree" that the PCR court failed to apply the prejudice test prescribed by the Supreme

Court and that, had the proper analysis been followed, the PCR court would have been

compelled to resolve that trial counsel's failure to object likely had a direct bearing on the

jury's guilty verdict. *See Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*,

541 U.S. 652, 664 (2004)).[10]

* * *

In sum, Witherspoon's trial counsel's failure to object to the stand-up order was

objectively deficient, prejudiced Witherspoon, and amounted to constitutionally ineffective

assistance of counsel. The PCR court's determination to the contrary is out of keeping

with the facts presented, but we do not simply conclude here that the court's ruling was

incorrect. Rather, as required to grant habeas corpus relief under AEDPA, we are

persuaded that the decision involved an unreasonable application of *Strickland*'s

---

[10] Witherspoon's trial counsel's response to the stand-up order may also have prejudiced Witherspoon's defense by hampering his direct appeal in South Carolina. We observe a reasonable probability that, had trial counsel objected to the trial court's order — or, assuming her statement could be read as a proper objection, *see supra* note 9, had she more clearly preserved the issue for appellate review — Witherspoon would have prevailed on appeal. *Strickland* directs that prejudice is not to be examined in a "mechanical" fashion, *see* 466 U.S. at 696, and the prejudice inquiry "is defined in different ways depending on the context in which it appears," *see Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911 (2017). Although we are satisfied that trial counsel's failure to object prejudiced Witherspoon at trial relative to the jury's guilty verdict, the full scope of the prejudice at hand may best be considered as reaching beyond the bounds of Witherspoon's trial.

33

principles. That is, the PCR court's disposition of Witherspoon's ineffective assistance claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103. The "unreasonable application" standard derived from § 2254(d)(1) preserves the authority to issue the writ in those cases where the state court decision plainly conflicts with the Supreme Court's precedent, and where necessary to "guard against extreme malfunctions in the state criminal justice systems." *See id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). We are assured that this is one of those cases, and that the district court therefore erred in its approval of the PCR Opinion.

IV.

Pursuant to the foregoing, we reverse the judgment of the district court denying relief and remand for the court to award Witherspoon a writ of habeas corpus unless the State of South Carolina endeavors to prosecute him in a new trial within a reasonable time.[11]

*REVERSED AND REMANDED*

---

[11] Our dissenting colleague has mischaracterized the relief afforded to Witherspoon by today's decision, proclaiming that "this federal Court orders the state of South Carolina to release a prisoner convicted of violating its laws." *See post* at 35. But we do no such thing. Rather, we remand to the district court and specify that Witherspoon is entitled to release only if South Carolina decides not to afford him a new trial. In so ruling, we in no way "intrude on state sovereignty." *See id.* We simply honor the Sixth Amendment and thereby fulfill the "meaningful role [of] the federal courts in safeguarding the constitutional rights of state prisoners." *See Elmore v. Ozmint*, 661 F.3d 783, 872 (4th Cir. 2011).

RUSHING, Circuit Judge, dissenting:

By its decision today, this federal Court orders the state of South Carolina to release a prisoner convicted of violating its laws because the majority believes that the prisoner's counsel should have urged one of her objections more strenuously after the state trial court overruled it. Because the state post-conviction review (PCR) court already considered and rejected this claim, federal law prohibits this Court from compelling such intrusive relief unless it concludes not merely that counsel "made errors so serious that [she] was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment," *Strickland v. Washington*, 466 U.S. 668, 687 (1984), but that "there is *[no] reasonable argument* that counsel satisfied *Strickland*'s deferential standard," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis added). Only when a state court's indulgence of *Strickland*'s presumption of adequate representation is "so lacking in justification" that no "fairminded jurist[]" could agree is a federal court entitled to disturb the state court's decision on post-conviction review and intrude on state sovereignty in the process. *Id.* at 101, 103.

The majority's purported application of these principles stitches them into window dressing. After making a de novo appraisal of counsel's effectiveness based on its own re-assessment of the record, the majority then summarily concludes that no reasonable jurist could disagree. *See supra*, at 29. No deference at all is paid to the state PCR court's factual findings, much less to its overall determination that Witherspoon did not suffer prejudicial *Strickland* error. Nor is any effort made to entertain the possible reasons for counsel's decision, as *Strickland*'s "strong presumption of competence" demands. *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). Because the majority's analysis runs contrary to

35

AEDPA—which leaves primary responsibility for these judgments with state courts—I respectfully dissent.

## I.

## A.

For the most part, I take no issue with the majority's presentation of the facts. Two prominent themes of the state PCR proceedings, however, are worth recounting.

First, from at least the close of evidence onward, Witherspoon's trial counsel faced difficulties lodging her objections. In her PCR testimony, which the state PCR court found "persuasive and credible," J.A. 44, counsel related that "there were a lot of interrupted statements" during trial, impeding her ability "to get []thing[s] out there," J.A. 298; *see*, *e.g.*, J.A. 197–198, 230. One instance occurred the same morning as the stand-up order, during an off-the-record meeting in chambers when counsel objected to the court's decision to provide an *Allen* instruction so soon into jury deliberations. Her objection evidently steamrolled, the conversation in chambers got "a little heated," counsel recalled. J.A. 288. "I certainly wasn't disrespectful, but it was -- I was basically informed, in certain terms, that we were going forward." J.A. 287–288. Although counsel did not get a chance to object again on the record before the judge issued the *Allen* charge, she tried immediately afterward to "preserve whatever I had talked about in chambers." J.A. 288; *see* J.A. 241.

Within thirty minutes of the *Allen* charge, the jury asked to review the button-cam footage again, specifically requesting to see "the side-view mirror, the image" depicting the suspect. J.A. 243–244. The judge ordered the prosecutor to skip to that portion and pause the video, at which point the image was enlarged and became "more pix[e]lated in

appearance." J.A. 290. Unprompted, the jury then asked for Witherspoon "to stand up and face [them]." J.A. 245. The following exchange occurred:

THE COURT:      Any objection?

[COUNSEL]:      I would, Your Honor, but . . .

THE COURT:      I think that is appropriate. Please stand. Please stand.

J.A. 246.

In her PCR testimony, counsel clarified that although she did not object to the freeze-framed image itself since the video "was already in evidence," she "was trying to object" to the stand-up order because she was "unhappy with the judge making my guy stand up beside the video." J.A. 290. While acknowledging that her objection was perhaps not "strenuous enough or clear enough," counsel maintained that her "statement was cut off," J.A. 290–291, saying, "[A]pparently I didn't get much out. I think that the decision [to issue the order] was made when the jury requested it, but I did attempt to object. It just apparently got shut down pretty instantly," J.A. 292. This notwithstanding that counsel described herself, generally, as "pretty forceful when I try to get something out there, so I have to assume that the [trial judge's] cutoffs were equally as forceful." J.A. 298. On cross-examination, counsel agreed that she "did object to" the stand-up order, "even though [she was] basically being cut off." J.A. 299. She expressed doubt that continuing to press her objection after the "judge ma[de] up his mind" would "change anything," explaining that "I would have gotten contempt, [Witherspoon] would still stand up and I think we -- it would have played out the same way." J.A. 299. Even so, counsel regretted the incident, conceding that "a more insistent objection" "should have been in there." J.A. 299.

37

A second theme from counsel's PCR testimony bears observing.  When explaining her overall trial strategy, counsel repeatedly stressed that the button-cam footage—specifically its lack of clarity—was "the one bright shiny spot we had in the case."  J.A. 277; *see* J.A. 277–279, 300.  As counsel explained, the suspect's "face wasn't clearly visible on the video.  That was very helpful to us."  J.A. 277.  Indeed, "that [wa]s [counsel's] whole point" to the jury: "You don't see Mr. Witherspoon's face on that video during the actual buy."  J.A. 277–278.

## B.

Based on counsel's testimony and the record before it, the state PCR court denied Witherspoon's petition for relief.  At the hearing, the PCR court observed that, with respect to "the judge requiring the defendant to stand up, it is clear from the record, from the trial transcript, that [counsel] objected to that.  What more could she do?"  J.A. 309.  (In response, Witherspoon's PCR attorney answered only that counsel should have "[m]ove[d] for mistrial."  J.A. 309.)  In its subsequent order, the PCR court continued to credit counsel's testimony that she objected to various of the judge's orders but "many of her objections were cut off or not considered."  J.A. 43.  Ruling on all of Witherspoon's ineffective assistance claims en masse, the PCR court found "persuasive and credible trial counsel's testimony that she attempted to object at all appropriate times" and concluded that counsel "had a valid and clearly articulable trial strategy that was in line with the prevailing norms of professional conduct."  J.A. 44.  Because Witherspoon presented no evidence that trial counsel's representation "was anything but professional and beneficial" to him, the PCR court held that Witherspoon failed to "demonstrate that trial counsel was

38

deficient" or that "he was in any way prejudiced by trial counsel's representation." J.A. 44; *see Richter*, 562 U.S. at 111 ("[W]hile in some instances even an isolated error can support an ineffective-assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." (internal quotation marks omitted)).

On federal habeas review in the District of South Carolina, the magistrate judge and district court judge both concluded that the PCR court's application of *Strickland* was not unreasonable. To the contrary, they held, the record revealed that "counsel objected to having Petitioner stand next to the image on the screen, and Petitioner has failed to direct this Court to any legal authority to support his argument that trial counsel should have handled the objection differently." J.A. 486; *see* J.A. 506. On this basis, the district court denied Witherspoon's habeas petition and declined to authorize an appeal. Our Court, however, granted a certificate of appealability on the single question now before us: Whether the state PCR court unreasonably applied federal law by deciding that trial counsel's attempted objection to the stand-up order was not ineffective assistance.

## II.

Although we review the district court's denial of habeas relief de novo, AEDPA demands that we give "considerable deference" to the decision of the state PCR court. *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). AEDPA prohibits federal courts from granting habeas relief unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts," *id.* § 2254(d)(2). Under this

deferential standard, a state-court decision "must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017) (internal quotation marks omitted). In other words, "a state prisoner must show that the state-court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

This standard is intentionally "difficult to meet," stopping just "short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Id.* at 102. The reason is plain: Federal habeas review of state criminal convictions is highly intrusive. *Id.* at 103; *see Williams v. Taylor*, 529 U.S. 420, 436 (2000). It not only "disturbs the State's significant interest in repose for concluded litigation" but also "frustrates both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Richter*, 562 U.S. at 103 (internal quotation marks omitted). After all, state courts are just as competent to adjudicate constitutional claims as we are, "[e]specially where a case involves such a common claim as ineffective assistance of counsel under *Strickland*—a claim state courts have now adjudicated in countless criminal cases for [over] 30 years." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). AEDPA, therefore, "further[s] the principles of comity, finality, and federalism" by requiring deference to state courts in all but the most exceptional circumstances. *Williams*, 529 U.S. at 436; *see Richter*, 562 U.S. at 102 (describing habeas corpus as "a guard against extreme malfunctions in the state criminal justice systems" (internal quotation marks omitted)).

40

Because Witherspoon asserts ineffective assistance of counsel, his claim comes to us encased in an additional layer of deference. *See Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020). To establish ineffective assistance under *Strickland*, a defendant must show that counsel's performance "fell below an objective standard of reasonableness" and that there was "a reasonable probability that . . . the result of the proceeding would have been different" absent counsel's alleged deficiencies. *Strickland*, 466 U.S. at 688, 694. In reviewing a *Strickland* claim, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687. That presumption requires us "not simply to give the attorneys the benefit of the doubt, but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Pinholster*, 563 U.S. at 196 (alteration and internal quotation marks omitted).

While "'[s]urmounting *Strickland*'s high bar is never an easy task,' it is 'all the more difficult' to establish 'that a state court's application of *Strickland* was unreasonable . . . under § 2254(d).'" *Owens*, 967 F.3d at 411 (alterations in original) (quoting *Morva v. Zook*, 821 F.3d 517, 528 (4th Cir. 2016)). When viewed through these "dual and overlapping lenses of deference," *id.* (internal quotation marks omitted), "the question is not whether counsel's actions were reasonable" but "whether there is *any reasonable argument* that counsel satisfied *Strickland*'s deferential standard," *Richter*, 562 U.S. at 105 (emphasis added).

41

III.

Witherspoon comes nowhere close to satisfying the "doubly deferential" standard of review we must apply to a *Strickland* claim evaluated under AEDPA.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  The majority's contrary conclusion contravenes this standard for at least four different reasons, any one of which is enough to leave the state court's decision undisturbed and affirm the denial of habeas relief.

A.

The majority's first and most obvious mistake is the one on which it hangs its entire analysis of *Strickland*'s performance prong: that counsel's "attempt[]" to object to the trial court's stand-up order was instead "failure" to object.  *Supra*, at 24.  Indeed, the majority claims, the state PCR court "cannot be interpreted as . . . finding that [counsel] actually objected."  *Supra*, at 23.

The majority's premise is wrong.  The PCR court's finding that counsel "attempted" to object to the stand-up order absolutely can be—and should be—read as a finding that she "actually objected" but was interrupted.  The PCR court said exactly that at the close of the hearing:  "The issue pertaining to . . . the judge requiring the defendant to stand up, it is clear from the record, from the trial transcript, that [counsel] *objected to that*."  J.A. 309 (emphasis added).  In its written order, too, the PCR court indicated that it believed counsel did object but "her objections were cut off."  J.A. 43.  Ignoring this context, the majority deliberately overreads the PCR court's use of the word "attempted" and, in a feat of linguistic alchemy, transforms the court's finding that counsel attempted to object into an *admission* that she "failed" to do so.  *Supra*, at 23.  Nowhere in the record does the PCR

42

court make such a finding. To the contrary, the court determined that counsel "attempted to object at all appropriate times," J.A. 44, that her objection to the stand-up order was "cut off," J.A. 43, and that there was little else counsel could have done once the trial judge made his position clear, J.A. 309. Section 2254(e)(1)'s presumption of correctness attaches to these factual finding by the PCR court. And those findings are amply supported—certainly they are not clearly and convincingly rebutted, *see* 28 U.S.C. § 2254(e)(1)—by the record evidence here. *See, e.g.*, J.A. 291 (counsel testifying that her "statement was cut off"); J.A. 292 (counsel testifying that she "did attempt to object" but was "shut down pretty instantly"); J.A. 299 (counsel agreeing that she "did object to" the stand-up order but was "cut off").

With the PCR court's true (and presumptively correct) factual findings in mind, the question becomes whether its application of *Strickland* was objectively unreasonable when it decided that counsel's cut-off objection did not amount to deficient performance. The majority says yes, apparently because it believes counsel's cut-off objection was insufficient to preserve the stand-up issue for appeal. *See supra*, at 24–25. Even granting the majority's unexplained assumption that appellate preservation is the standard by which to judge whether an objection was constitutionally deficient,[1] the law surrounding the

---

[1] For purposes of argument, I will assume—as do the parties and my colleagues in the majority—that the correct measure by which to assess counsel's performance for *Strickland* purposes is to equate an insufficiently preserved objection with deficient performance. Not all courts agree with this approach. *See, e.g.*, *Woodfox v. Cain*, 609 F.3d 774, 806 (5th Cir. 2010) (rejecting ineffectiveness claim where counsel's "attempt to object," though deemed "insufficient to preserve error" by the state appellate court, made it "apparent that counsel was not simply sitting idly by"). Here, too, one might reasonably (Continued)

preservation of trial objections is not as cut-and-dry as the majority's analogy to a river and its banks would suggest. *See supra*, at 24.

South Carolina courts and their federal counterparts routinely recognize that incomplete or interrupted objections can constitute substantive, preserved objections in some cases. Consider, for example, the South Carolina Supreme Court's decision in *State v. Ross*, 249 S.E.2d 159 (S.C. 1978). The attempted objection there read as follows:

| | |
|---|---|
| [PROSECUTOR]: | Did you ever try to break it off with her? |
| [WITNESS]: | Yes, I did. |
| [PROSECUTOR]: | And what happened? |
| [DEFENSE]: | Your Honor, I don't know what we're trying. |
| THE COURT: | We're trying a murder case. |
| [DEFENSE]: | Yes, sir, but he's going into . . . |
| THE COURT: | A relationship between the State's witness and the Defendant, which I think is relevant, if he doesn't get into too many true confessions. |

*Ross*, 249 S.E.2d at 160. While conceding that defense counsel "did not clearly set forth the basis of his objection" in this exchange with the judge, the state Supreme Court nevertheless considered the error preserved because the trial judge may have "interrupted the attempted explanation." *Id.* at 161. In so reasoning, the court specifically "decline[d] to hold that, in order to preserve an objection, when the judge begins to speak[,] counsel must try to speak over him." *Id.*; *see Allegro, Inc. v. Scully*, 791 S.E.2d 140, 145 (S.C.

---

conclude that regardless of whether counsel's attempted objection was enough to preserve the stand-up issue for appeal, her performance was not outside the bounds of *Strickland* competence because, for example, her objection was heard by the trial judge.

44

2016) ("The utility of [preservation] rules would be grievously undermined were we to construe them to require futile additional argument after the trial judge has made his position clear."), *abrogated on other grounds by Hall v. UBS Fin. Servs. Inc.*, 866 S.E.2d 75 (S.C. 2021).

This approach comports with the preservation rules our Court has observed. *See United States v. Swaim*, 642 F.2d 726, 730 (4th Cir. 1981) ("If a trial court wishes to interrupt and rule on an incomplete objection . . . the defendant may raise on appeal the objections which were apparent at the time the objection was interrupted by the trial court."). The Fifth Circuit, too, has held that unexplained objections may still be preserved when a "court 'cut[s] off' counsel's attempts to respond by interrupting her and overruling her objections mid-sentence." *United States v. Salazar*, 743 F.3d 445, 449 (5th Cir. 2014). In circumstances like these, an attorney may be "'entitled to believe that further explanation would not be welcomed or entertained by the [trial] court.'" *Id.* (quoting *United States v. Mendiola*, 42 F.3d 259, 260 n.2 (5th Cir. 1994)); *accord Mendiola*, 42 F.3d at 260 n.2 (finding an objection preserved when the court ruled on it before counsel had an opportunity to explain it fully).

At a minimum, then, the caselaw suggests that "fairminded jurists could disagree" on whether counsel's attempted objection to the stand-up order was sufficient to preserve the argument. *Richter*, 562 U.S. at 102. The majority's only response is to quarrel with the possibility that any jurist could read this record as suggesting that an objection was raised, interrupted, and ruled on by the trial judge. That reading is unreasonable, the majority tells us, because the "plain meaning" of the words used in counsel's exchange

with the judge—"I would, Your Honor, but . . ."—clearly shows that her attempt to object was hollow and qualified. *Supra*, at 23–24. The majority reads too much into a court reporter's transcription of five words with broad and variable colloquial meaning, asking us "to parse those words 'as though we were dealing with the language of a statute.'" *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1034 (Gorsuch, J., concurring) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). And it does not even entertain the possibility that something other than "I choose not to"—perhaps an explanation like, "I need a moment to confer with my client"—might have followed the ellipses here.

Worse, in concluding that the *only* interpretation of this interrupted objection is its own, the majority misses the point of AEDPA. It may be true that counsel's "conditional" language casts doubt on the prospect that a more forceful or unambiguous objection would have been forthcoming absent the judge's interruption. *Supra*, at 23–24. But that does not mean the PCR court was objectively unreasonable in concluding otherwise. When it found that counsel appropriately "attempted to object," the state PCR court could have reasoned that counsel's objection was adequate because the grounds for it were so "apparent from the context" that further explanation was unnecessary. S.C. R. Evid. 103(a)(1); *see Swaim*, 642 F.2d at 730. It could have decided that such explanation was especially unnecessary in this case because the judge had already "made his position clear," *Allegro*, 791 S.E.2d at 145, by deeming the jury's request "appropriate" and immediately ordering Witherspoon to comply, J.A. 246. And the PCR court could have surmised that, faced with these circumstances, counsel was "entitled to believe that further explanation would not be

46

welcomed" by the trial judge. *Mendiola*, 42 F.3d at 260 n.2; *see Ross*, 249 S.E.2d at 161.

Whether the PCR court erred, or even clearly erred, in making these judgment calls is not the relevant question—although even under *that* standard, the question is a close one. Rather, AEDPA limits our inquiry to whether the state court's decision "is so erroneous that there is no possibility fairminded jurists could disagree" about it. *Nevada v. Jackson*, 569 U.S. 505, 508–509 (2013) (internal quotation marks omitted). Plainly it is not. Every previous judge to have considered this issue has determined that counsel did not fail to object but rather attempted to object then was cut off and overruled. The same judges have then concluded that, because counsel objected, there was no *Strickland* error. The majority concludes that the only reasonable decision is its own, but it can do so only by contorting the PCR court's factual finding to mean the opposite of what it says.[2] That approach cannot be squared with AEDPA.

## B.

Because Witherspoon's failure-to-object premise lies at the heart of his habeas petition, a conclusion that the PCR court was not unreasonable in determining that counsel

---

[2] In a footnote, the majority maintains that, even if counsel made "a bona fide objection," she still performed deficiently because the majority is "confident" that a competent attorney "would have made her objection plain and unmistakable." *Supra*, at 29 n.9. Since "plain and unmistakable" is not the test for whether a trial objection has been adequately preserved under South Carolina law, it is not clear why we should use that exacting measure to judge whether counsel has met the "minimal standard of competence" for attorneys practicing in that community. *Hinton v. Alabama*, 571 U.S. 263, 272 (2014). And the Supreme Court has instructed that a federal court's "confidence in the result it would reach under *de novo* review" is not the standard for measuring unreasonableness under § 2254(d). *Richter*, 562 U.S. at 102.

did object should end the case. Yet, even accepting Witherspoon's erroneous premise that counsel failed to object, there are additional reasons to reject his claim under AEDPA and *Strickland*'s "double-deference standard." *Morva*, 821 F.3d at 528. This is because *Strickland*'s "strong presumption of competence" requires that we "*affirmatively* entertain the range of possible reasons . . . counsel may have had for proceeding as [she] did," *Pinholster*, 563 U.S. at 196 (emphasis added) (internal quotation marks omitted), regardless of whether those reasons were "brought to our attention" by the PCR court, *supra*, at 28. *Cf. Richter*, 562 U.S. at 98 (holding that even summary rulings are entitled to AEDPA deference). Then we must ask whether "no fair-minded jurist could find one of those reasons to be sound trial strategy." *Valentino v. Clark*, 972 F.3d 560, 581 (4th Cir. 2020). As the Supreme Court instructs, this is an "objective" inquiry that does not depend on counsel's "subjective state of mind." *Richter*, 562 U.S. at 110.

Here, the record supports at least two strategic reasons for counsel's decision not to object or to pursue the objection more forcefully once the judge deemed the jury's stand-up request "appropriate." J.A. 246. At the PCR hearing, counsel herself provided one such explanation: She did not want the jury to draw a negative inference from any apparent effort to defy its request. In fact, when asked directly whether that concern had crossed her mind, counsel agreed with Witherspoon's PCR attorney that she was "in that when-did-you-stop-beating-your-wife situation, because if he doesn't stand up, the jury is going to draw negative inferences from that." J.A. 292; *cf. Daugherty v. Dugger*, 839 F.2d 1426, 1431 (11th Cir. 1988) (finding attorney's performance reasonable under *Strickland* where his decision stemmed from a "fear[]" of "the negative inference the jury might draw").

48

A decision not to trigger this negative inference may have appeared all the more reasonable in view of counsel's strategy, during trial, to play up the fact that Witherspoon's face was not visible on the blurry video. Counsel repeatedly affirmed that one of her principal trial strategies was to emphasize the button-cam video, which "was very helpful to us" because it did not capture "a great depiction" of the suspect and was "part of the reason [Witherspoon] wanted to go to trial" in the first place. J.A. 277. As counsel explained, "[y]ou don't see Mr. Witherspoon's face on that video," even though "[t]he officer's face was clear as they were adjusting the video for the buy." J.A. 277–278; *see* J.A. 278 (counsel agreeing with Witherspoon's PCR attorney that "you couldn't really see him, you couldn't see his face" on the video). In counsel's judgment, "[t]he video in this case was not everything that the State probably should have had. It was probably the one bright shiny spot we had in the case . . . [because] my client's face wasn't clearly visible on the video." J.A. 277; *see* J.A. 278–279 ("Actually, it was helpful that you couldn't see anything well."); *see also* J.A. 42 (PCR court crediting counsel's testimony that "the video did not seem detrimental, as it did not show Applicant's face with any clarity"). Counsel could have reasonably believed that the potential downside of opposing the jury's request and subsequent stand-up order outweighed the possibility that viewing the blurry, pixelated image of the suspect in the side-view mirror would harm Witherspoon's case. *See* J.A. 290 (counsel recalling that the video was even less clear "when you blow it up").

A second legitimate explanation would be that counsel did not want "to antagonize the judge or jury" by persisting with an objection the judge had already shut down. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 328 (2009); *see* J.A. 299 (counsel

49

testifying that objecting more vigorously may "have gotten [her] contempt"). This concern may have seemed especially palpable "from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, given that many of her previous objections were cut off "forceful[ly]," J.A. 298, and things got "a little heated" with the judge just thirty minutes earlier during their exchange about the *Allen* charge, J.A. 288. The majority discounts this rationale as inconsistent with "zealous representation," *supra*, at 28, but overlooks the fact that holding one's tongue for fear of irritating the judge or jury can be its own form of zealous advocacy—especially when it comes at the comparatively low price of re-attempting an objection that was once denied and would likely be denied again. More importantly, in disdaining counsel's efforts "to avoid a sparring match with the judge," *supra*, at 28, the majority seems oblivious to the fact that fairminded jurists can and do disagree about this strategy. *See*, *e.g.*, *Leavitt v. Arave*, 646 F.3d 605, 611 (9th Cir. 2011) (explaining that "[a] decision to avoid annoying the judge [by renewing a previous motion] falls well within *Strickland*'s range of reasonableness"); *Bennett v. Angelone*, 92 F.3d 1336, 1349 (4th Cir. 1996) ("As other courts have noted, refraining from objecting to avoid irritating the jury is a standard trial tactic.").

These "possible reasons" for counsel's decision not to object, *Pinholster*, 563 U.S. at 196 (internal quotation marks omitted), demonstrate that declining to object or to object more forcefully could have been the product of rational trial strategy in this circumstance. "If this case presented a *de novo* review of *Strickland*," that prospect alone "might well suffice to reject the claim of inadequate counsel." *Richter*, 562 U.S. at 109. But our review here is even more constrained. Because there is at least a "reasonable argument that

50

counsel satisfied *Strickland*'s deferential standard," *id.* at 105, the PCR court's conclusion that counsel's conduct was not deficient but instead in line with "a valid and clearly articulable trial strategy," J.A. 44, cannot be unreasonable.  For this independent reason, too, the majority errs in granting habeas relief.

C.

Yet there are more layers of error in the majority's decision.  Even assuming that counsel's cut-off objection should be considered a failure to object, and even assuming that declining to object could not be considered sound trial strategy by any fairminded jurist, the majority is *still* wrong to find the PCR court's decision objectively unreasonable, because a stand-up demonstration of the kind Witherspoon was asked to make does not unambiguously qualify as objectionable "new evidence" under the caselaw.

The cases the majority cites certainly say nothing of the sort.  *See supra*, at 25.  Four of the five cases involved exhibits that were never admitted into evidence but were erroneously sent to the jury room during deliberations.  *See United States v. Lentz*, 383 F.3d 191, 217–219 (4th Cir. 2004); *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984); *State v. Rogers*, 80 S.E. 620, 620–621 (S.C. 1914); *State v. Hill*, 714 S.E.2d 879, 324 (S.C. Ct. App. 2011).  In the fifth case, the South Carolina Supreme Court actually approved of the jury reviewing a transcript that was not entered into evidence while it listened again to the transcribed phone call.  *See State v. Winkler*, 698 S.E.2d 596, 585 (S.C. 2010).  Although the court described this presentation as "mirror[ing] the way in which the evidence was presented at trial" in that case, *id.*, it did not mandate that all evidentiary presentations during jury deliberations "must" do so, *supra*, at 25.  In short, the

51

majority fails to cite a single case supporting its premise that the stand-up order presented the jury with new evidence during deliberations in violation of South Carolina law.

Witherspoon, meanwhile, acknowledges that courts have reached different conclusions on this question. He assembles a handful of cases from other jurisdictions to buoy his position, each finding that a defendant's display of some physical characteristic after the close of evidence constitutes impermissible new evidence. *See, e.g.*, *United States v. Santana*, 175 F.3d 57, 63–64 (1st Cir. 1999) (display of defendant's ears, which were covered by headphones throughout the trial, qualifies as new evidence); *Caver v. State*, 52 So. 3d 570, 574 (Ala. Crim. App. 2010) (display of defendant's arms, which had not been visible during trial, qualifies as new evidence); *Lockett v. State*, 296 So. 3d 920, 921–922 (Fla. Dist. Ct. App. 2020) (display of the left side of defendant's face "with his hand covering his cheek" qualifies as new evidence). But even Witherspoon admits that some courts have approved of procedures like the stand-up order here because they do not create new evidence. For example, in *Washington v. United States*, 881 A.2d 575 (D.C. 2005), which Witherspoon himself cites, the D.C. Court of Appeals held that "the jury was free to examine the facial characteristics of [the defendant] during its deliberations"—"up close, and at multiple angles, even though he did not testify at trial and was not shown to the jury in a similar fashion during the trial"—"and that this demonstration did not constitute 'new evidence[.]'" *Id.* at 580–581. By the same token, a number of courts, including our own, have determined that the act of magnifying existing evidence for the jury's view during deliberations does not create new evidence "'where such action involves merely a more critical examination of an exhibit.'" *United States v. Holmes*, 30 Fed. App. 302, 310 (4th

52

Cir. 2002) (quoting *United States v. Beach*, 296 F.2d 153, 159 (4th Cir. 1961)); *see also United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995) (affirming the denial of a motion for new trial because "[n]o 'new evidence' resulted from the jurors' use of a magnifying glass to examine the fingerprint cards and gun").

These cases alone decide the question. Whether we would, on de novo review, agree with Witherspoon that standing next to an enlarged image of the suspect qualifies as "new evidence" is not the inquiry under AEDPA. As the variety of caselaw shows, reasonable jurists *do* disagree about whether physical displays at the jury-deliberation stage amount to new evidence, especially where the feature to be displayed has been visible throughout trial. Certainly it is not "beyond debate," *Valentino*, 972 F.3d at 582, whether counsel should have recognized the stand-up display as new evidence, particularly when courts in South Carolina have not previously addressed the situation. *See Richter*, 562 U.S. at 105 ("The *Strickland* standard is a general one, so the range of reasonable applications is substantial.").

## D.

Finally, fairminded jurists could even disagree about whether counsel's conduct prejudiced Witherspoon. The majority again sidelines the relevant question, which is not merely whether the physical display swayed the jury's decision, *see supra*, at 32, but whether a more strenuous objection by counsel would have changed the judge's mind about issuing the stand-up order in the first place. *See, e.g.*, *Pryor v. Norris*, 103 F.3d 710, 713 (8th Cir. 1997) ("Since the trial judge would not have sustained the objection even if it had been made at a timely manner, the appellant is unable to show that his counsel's failure to

object . . . had an adverse effect on the outcome of the trial." (internal quotation marks omitted)); *United States v. Smith*, 497 Fed. App. 269, 273–274 (4th Cir. 2012) (rejecting ineffectiveness claim "for lack of prejudice" because the "district court has made clear that . . . [it] would have overruled the objection").

Although such a prediction is rarely free from doubt, it certainly was not unreasonable for the South Carolina PCR court to conclude that Witherspoon had not demonstrated a substantial likelihood that a more forceful objection would have prevented the stand-up order. *See Pinholster*, 563 U.S. at 189 (explaining that a "reasonable probability" for purposes of *Strickland*'s prejudice prong "requires a substantial, not just conceivable, likelihood of a different result" (internal quotation marks omitted)). For one thing, the record suggests that the trial judge's mind was made up. *See* J.A. 292 (counsel testifying that the "decision [to issue the order] was made when the jury requested it"). Indeed, counsel testified that she believed pressing her objection would not have "change[d] anything. I would have gotten contempt, [Witherspoon] would still stand up and I think we -- it would have played out the same way." J.A. 299. For another, South Carolina courts have given no indication that counsel's attempted objection was meritorious. Although the parties cite competing decisions from other jurisdictions, the dearth of South Carolina authority on this score leaves considerable uncertainty about whether the judge would have sustained such an objection.

The same uncertainty in the law hampers any attempt to assert that, had an objection preserved the issue, there could be no disagreement that a South Carolina appellate court was substantially likely to rule in Witherspoon's favor on appeal. *See supra*, at 33 n.10

54

(positing, de novo, a "reasonable probability" that Witherspoon would have prevailed on appeal, without applying AEDPA's deferential standard). Nor was that theory tested here: Neither in his pro se brief nor in his attorney's brief on direct appeal did Witherspoon suggest the trial judge erred in issuing the stand-up order.[3] Under these circumstances, the state PCR court was not objectively unreasonable in concluding that Witherspoon "failed to prove he was in any way prejudiced" by counsel's attempted objection. J.A. 44.

## IV.

We are neither the first court, nor the one best positioned, to review Witherspoon's claim of ineffective assistance. But we are the first to grant relief on it. In so doing, the majority commits at least four different errors—the recognition of any one of which is enough to affirm the district court's judgment denying habeas relief. After substituting its own factual finding for that of the state PCR court, the majority discounts any possible strategic reason for counsel's choice about how to best represent her client and then proceeds on the entirely unfounded assumption that South Carolina courts would adopt Witherspoon's view of the law. Because I do not think any of these choices can be squared with the deferential standards to which AEDPA and *Strickland* bind us, I respectfully dissent.

---

[3] The majority speculates that the reason neither Witherspoon nor his attorney raised the stand-up issue on direct appeal, and the reason the South Carolina Court of Appeals failed to catch that issue in its *Anders* review, is that they all believed it was not adequately preserved for appeal. *See supra*, at 29–30 n.9. This conclusion ignores an explanation that is at least as obvious, if not more so: that no one considered the stand-up order to be an error at all.

55