**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-6044**

RONALD COX,

Petitioner – Appellant,

v.

WARDEN RONALD S. WEBER; ATTORNEY GENERAL ANTHONY G. BROWN,

Respondents – Appellees.

**No. 23-6148**

RONALD COX,

Petitioner – Appellee,

v.

WARDEN RONALD S. WEBER; ATTORNEY GENERAL ANTHONY G. BROWN,

Respondents – Appellants.

Appeals from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, Senior District Judge.  (8:19–cv–03443–DLB)

Argued:  January 26, 2024                      Decided:  May 23, 2024

Before WYNN, HARRIS, and QUATTLEBAUM, Circuit Judges.

---

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wynn and Judge Harris joined.

---

**ARGUED:** Daniel Jay Wright, Rockville, Maryland, for Appellant/Cross-Appellee. Jer Welter, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants. **ON BRIEF:** Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees/Cross-Appellants.

---

QUATTLEBAUM, Circuit Judge:

A Maryland state court jury convicted Ronald Cox of first-degree murder and three firearm offenses. At trial, the State's primary evidence tying Cox to those crimes was the testimony of a jailhouse informant, who claimed that Cox and his co-defendant told him of their involvement in the murder. Though jail records purported to show that Cox and the informant were not in the same area of the jail on the day the informant claimed the conversation occurred, Cox's trial counsel declined to introduce those records into evidence. Cox unsuccessfully sought postconviction relief based on ineffective assistance of counsel. After the state postconviction court denied Cox's petition, Cox petitioned under 28 U.S.C. § 2254 for habeas relief. The district court denied Cox's petition but issued a certificate of appealability on Cox's ineffective assistance claim.

Now, Cox appeals the district court's denial of his § 2254 petition, and the State cross-appeals the district court's issuance of the certificate of appealability. Despite the State's invitation, we find no reason to dismiss the certificate of appealability. And due to the highly deferential standard governing § 2254 petitions alleging ineffective assistance of counsel, we affirm the district court's denial of Cox's petition.

I.

A.

On December 28, 2007, at around 12:38 p.m., a Baltimore City Police Department officer responded to a report of a shooting at a shopping center. The officer found Todd Dargan lying on the ground, bleeding and unresponsive. Dargan had been fatally shot in the head. The officer located a nine-millimeter cartridge casing at the scene.

Shortly before the officer found Dargan, at approximately 12:30 p.m., three Baltimore City Police Department detectives in an unmarked police car were patrolling an area 10 blocks away from the shopping center. The detectives saw Ronald Cox driving without a seatbelt. When Cox failed to stop at a stop sign, the detectives pulled him over. Sitting in the front passenger seat of the car was Rodney Johnson.

During the traffic stop, a series of calls came over the detectives' radios reporting the shooting at the shopping center. Though Cox appeared calm, the detectives noticed that Johnson's hands were shaking. This prompted one of the detectives to pat Johnson down outside of the vehicle. When the detective did not find anything, he ordered Johnson to sit on the curb while Cox remained in the car.

Between 15 and 23 minutes after initiating the stop, the detectives heard a broadcast over their radios describing the shooting suspect as a "black male wearing a black hoodie." J.A. 170. Noting that Johnson matched this description, one of the detectives asked Cox if he had anything in the car. Cox responded by stepping out of the car with his hands in the air. Taking this as Cox's consent to search, the detective searched the vehicle and found a nine-millimeter handgun in the trunk. The detectives then placed Cox and Johnson under

4

arrest and took them to the Baltimore Central Booking and Intake Center ("Central Booking").

## B.

The State filed three separate indictments against Cox in the Circuit Court of Baltimore City, charging him with first-degree murder, three firearm offenses and conspiracy to commit murder. Johnson also faced charges of murder and handgun offenses. Cox's case was initially joined with Johnson's, but the Circuit Court severed the cases for trial.

Cox filed two pretrial motions to suppress. First, he moved to suppress the handgun and testimony about its recovery, arguing that they were fruits of an unlawfully prolonged traffic stop. The trial court agreed, finding that the detectives did not have reasonable suspicion or probable cause to extend the stop, nor did they have consent to search Cox's vehicle.

Second, Cox moved to suppress incriminating statements attributed to him and Johnson by a jailhouse informant, Michael West. At a pretrial hearing on the motion, West testified that he saw Cox and Johnson at Central Booking on December 29, 2007, the day after Dargan's murder. He stated that while they were in the "day room" at Central Booking, Johnson began telling him about shooting Dargan—whom West had known since childhood—while Cox listened and occasionally added details. According to West, Johnson stated that he and Cox had been driving by the shopping center when Cox saw Dargan, whom Cox had identified as having been involved in the murder of an acquaintance. West recalled Johnson stating that Cox offered him $15,000 to kill Dargan.

5

West stated that Johnson said he accepted the offer, so Cox gave him a nine-millimeter pistol and dropped him off on a street next to the shopping center. According to West, Johnson said he ran up to Dargan and shot him in the head. Johnson purportedly stated, as West recounted, that he then met up with Cox on a street around the corner and put the gun in the trunk of the car. Johnson then supposedly told West about getting stopped by the police, prompting Cox to mention that the police noticed that Johnson seemed nervous.

Cox's trial counsel objected to the admission of the statements attributed to Cox as fruits of the poisonous tree, arguing that Cox would not have been at Central Booking had he not been arrested during the unlawfully prolonged traffic stop. The trial court rejected this argument, finding that Cox independently chose to speak with West. As for the statements attributed to Johnson, Cox's counsel argued that the statements were inadmissible hearsay. But the trial court denied the motion to suppress, finding Johnson's statements to be admissions of Johnson tacitly adopted by Cox. However, the trial court precluded West from testifying to Johnson's statements about what happened between the time Johnson left the car and the time he returned, since Cox had no firsthand knowledge of what occurred during that timeframe and, therefore, could not have tacitly adopted them.

Ten days before Cox's trial, a jury acquitted Johnson of all charges. The trial court ruled that Cox could not introduce Johnson's acquittal to the jury. The State dropped its conspiracy charge against Cox but otherwise proceeded with its prosecution.

At Cox's trial, the State presented testimony from the officer and three detectives who responded to the shooting, an evidence technician who processed the shooting scene, the medical examiner who conducted Dargan's autopsy and one of the detectives involved

6

in the traffic stop. The officer who first arrived at the shooting scene testified to finding the bullet casing and a head wrap or "do-rag." The evidence technician testified that the bullet casing had been dusted for fingerprints, but none had been found. The medical examiner testified that Dargan had been shot in the head. And the detective from the traffic stop testified that Cox was in the vehicle stopped near the scene. Besides the testimony that Cox was stopped nearby, none of those witnesses or the evidence introduced through them implicated Cox. For that, the State relied on West.

West's trial testimony about his conversation with Johnson and Cox was consistent with his testimony at the pretrial hearing, with the exception of the excluded statements attributed to Johnson about what allegedly occurred between the time Johnson left Cox's car and returned. West added that his day room conversation with Johnson and Cox took place "probably after eight" in the morning and lasted around 45 minutes or an hour. J.A. 275. West stated that, after spending a few more hours in the day room following the conversation, he used one of the phones there to call the homicide detective who had interviewed him the day before after his own arrest. Having known Dargan since childhood, West reasoned that he called the homicide detective because he "had just found out [his] friend got killed." J.A. 302.

West testified that the homicide detective retrieved him from Central Booking later that week and brought him to the homicide division to be interviewed. He recalled identifying Johnson and Cox in separate photo arrays. On the back of the photo array including Cox's image, West said he wrote a statement describing what Johnson and Cox told him. At trial, West read his written statement on the back of the photo array, which

7

had been admitted into evidence, to the jury. West testified that neither the State nor the homicide detectives gave or promised him anything for his testimony.

Cox's counsel then cross-examined West about the layout of the Central Booking day room and surrounding cells, including the fact that the day room phones were out in the open. West affirmed that other inmates could see him making his phone call. West also affirmed that all phone calls made from the day room phones were recorded and that all detainees at Central Booking wore bracelets with barcodes that officials scanned to track their movements between locations in the facility.

Cox's counsel obtained a number of concessions during cross-examination. West admitted that he had originally been charged with a firearm offense under Maryland law but had since been federally indicted. West acknowledged that he entered into a plea agreement in his federal case a few weeks before Cox's trial. He conceded that he was facing a prison sentence of 10-to-15 years to life. He further acknowledged that his plea agreement provided that federal prosecutors could ask the court for a lower sentence if he assisted in the prosecution of others. However, West said that he did not think testifying against Cox in state court would affect his federal sentence. Still, he admitted that he was not cooperating in any other state or federal investigations.

Cox declined to testify in his own defense. However, he called West's federal public defender to testify that the government could file a motion in West's case that would permit a lower sentence based on his cooperation in Cox's case.

In her closing argument, Cox's counsel criticized the State's failure to introduce a recording of the phone call West claimed to have made to a detective from the day room

8

phones, as well as its failure to introduce the testimony of the detective who West purportedly called. She also questioned the State's failure to introduce records showing, or witnesses corroborating, that Cox and West were in the Central Booking day room together, as West claimed.

After deliberating for around four hours, the jury found Cox guilty of first-degree murder and three firearm offenses. Cox was later sentenced to life in prison for the first-degree murder conviction plus 20 years for the firearm convictions.

## C.

Cox unsuccessfully challenged his convictions on direct appeal. *See Cox v. State*, 5 A.3d 730 (Md. Ct. Spec. App. 2010), *aff'd*, 28 A.3d 687 (Md. 2011). He subsequently sought relief from the state postconviction relief ("PCR") court. Through postconviction counsel, Cox raised 17 claims. On appeal, he challenges the district court's ruling on only one of those claims—an ineffective assistance of counsel claim under *Strickland v. Washington*, 466 U.S. 668 (1984).

Cox argued that his trial attorney rendered ineffective assistance by failing to introduce offender activity logs from Central Booking at trial. Noting that Central Booking officials tracked inmates' movements by scanning their barcoded bracelets, Cox asserted that his offender activity log from his time at Central Booking showed that he was in a holding cell on the morning that West claimed to have spoken with him and Johnson in the day room. Cox also alleged that, during the time he was in that holding cell, West's offender activity log placed West in a different part of Central Booking. Cox maintained that the activity logs confirmed that he was never in the day room with West. According to

9

Cox, his trial counsel refused to obtain the activity logs from Central Booking, despite their potential to cause jurors to doubt West's story.

In December 2017, the state PCR court held a hearing on Cox's petition. Cox introduced the activity logs. Contrary to Cox's initial suggestion, though, his postconviction counsel confirmed that trial counsel did, in fact, obtain the activity logs from Central Booking before Cox's trial. Still, Cox called Lieutenant Weinberg, who worked at Central Booking, to testify about the records. Lt. Weinberg explained that every inmate at Central Booking wore a wristband with a unique barcode that officials scanned whenever the inmate moved between locations in the facility. She testified that West's activity log indicated that prison officials moved West to the facility's committed cell[1] at 3:17 a.m. on December 29, 2007, the morning that he claims he spoke with Cox and Johnson in the Central Booking day room. And Lt. Weinberg said that, on the same day, Cox's activity log indicated that Cox was in a holding cell from 3:36 a.m. to 9:51 a.m. Lt. Weinberg stated that these cells were "not close to each other." J.A. 374.[2]

Trial counsel also testified at the postconviction hearing. She explained that, at the time of Cox's trial, she had been a criminal defense attorney for 16 or 17 years. Consistent

---

[1] Central Booking inmates are placed in the committed cell after learning of the charges against them at a hearing before a commissioner.

[2] There is no indication in the record that Lt. Weinberg testified about other December 29 entries in the activity logs. However, the activity logs admitted at the postconviction hearing indicate that Cox was in Central Booking's "Group Holding Cell"—where the Central Booking day room is supposedly located—from 9:55 a.m. until 12:10 p.m. J..A. 402. West's activity log suggests that he was only in the "Group Holding Cell" from 1:40 a.m. until 3:17 a.m., before supposedly being moved to the committed cell. J.A. 403.

with the acknowledgment of Cox's postconviction counsel, trial counsel testified that she obtained the activity logs from Central Booking prior to Cox's trial. She stated that she spoke with the records custodian from Central Booking about testifying about the activity logs and consulted with Johnson's attorney "about that piece of the case." J.A. 376. But trial counsel recalled that the records custodian planned to testify that the activity logs "are often not terribly accurate and they lose people and people move around all the time." J.A. 378. She also testified that she knew the prosecutor handling Cox's case had previously worked as a commissioner at Central Booking, so he had "a unique skill set and knowledge and background into the unreliability of the records produced by Central Booking." J.A. 378.

Trial counsel explained that she "made a strategic decision not to put [the activity logs] before the jury because [she] thought [they] would not be helpful." J.A. 380. When pressed on her decision, she reasoned, "I chose not to present that evidence because I thought the vulnerability of the testimony from the custodian of records was too much of a vulnerability." J.A. 381. But trial counsel noted that by showing the jury that there was "very little evidence to corroborate" West's testimony through cross-examination of the State's witnesses and closing argument, she achieved some of the same benefits of the records without the risks of introducing them. J.A. 381.

The state PCR court subsequently denied Cox's petition. It concluded that trial counsel's decision to not introduce the activity logs constituted a "valid trial tactic" that did not qualify as deficient performance under *Strickland*. J.A. 176. Though Cox applied

11

for leave to appeal the state PCR court's decision, the Maryland Court of Special Appeals[3] denied his application.

## D.

In December 2019, Cox petitioned under 28 U.S.C. § 2254(d) for habeas corpus in the District of Maryland. Relevant here, Cox raised the same ineffective assistance claim concerning his trial counsel's failure to introduce the activity logs. Cox argued that the state court incorrectly determined that trial counsel's decision was a valid trial tactic. Cox also continued to argue that trial counsel did not obtain the activity logs prior to his trial, despite his own postconviction counsel's prior recognition that she had.

The district court denied Cox's habeas petition. The district judge stated, "Respecting the 'doubly deferential' standard applicable to ineffective assistance of counsel claims, I will defer to the [state PCR court's] conclusion that trial counsel's performance was not deficient and deny relief on this claim." J.A. 467. But the district court recognized, "Arguably, there is a possibility that the [state PCR court's] finding may constitute an unreasonable application of *Strickland* to the facts of Mr. Cox's case." J.A. 467. The district court explained that because "the State's case rested entirely on Mr. West's testimony of Mr. Cox's tacit admissions, the [state PCR court's] finding that 'the records clearly show that [Cox] and Mr. West were never in the same room' seems to be inconsistent with a finding that Mr. Cox's counsel was not deficient." J.A. 467 (quoting state PCR court opinion).

---

[3] The Maryland Court of Special Appeals has since been renamed the Appellate Court of Maryland.

The district court "believed it [could] be considered a 'close call' as to whether the state courts' decisions denying relief involved an unreasonable application of *Strickland*." J.A. 467. It stated that, although it was deferring to the state PCR court's determination that Cox's trial counsel's performance was not deficient, it was "reluctant to conclude that reasonable jurists would not find its assessment of the claim debatable or wrong." J.A. 467. The district court reasoned that, despite its ruling, Cox's ineffective assistance claim was "adequate to deserve encouragement to proceed further." J.A. 477. Accordingly, the district court issued a certificate of appealability limited to the question of "whether trial counsel rendered ineffective assistance of counsel by failing to utilize the booking records as part of Mr. Cox's defense at trial." J.A. 477–78.

Cox timely appealed the denial of his § 2254 petition, while the State timely cross-appealed the district court's issuance of the certificate of appealability.

## II.

A habeas petitioner "has no absolute entitlement to appeal a district court's denial of his petition" for habeas relief. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). Instead, 28 U.S.C. § 2253(c)(1) provides that an appeal may not be taken to the court of appeals "unless a circuit justice or judge"—which courts construe to encompass a district judge— "issues a certificate of appealability." *Gonzalez v. Thaler*, 565 U.S. 134, 143 n.5 (2012); Fed. R. App. P. 22(b)(1). Under § 2253(c)(2), "[a] certificate of appealability may issue under [§ 2253(c)(1)] only if the applicant has made a substantial showing of the denial of a constitutional right."

13

This requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal quotes omitted). That is, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) provides that the certificate of appealability "shall indicate which specific issue or issues satisfy the showing required by [§ 2253(c)(2)]."

When a petitioner obtains a certificate of appealability to appeal a district court's denial of his habeas petition, we review that denial de novo. *Richardson v. Kornegay*, 3 F.4th 687, 695 (4th Cir. 2021). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), an inmate in state custody may petition a federal court for a writ of habeas corpus on the ground that he is in custody in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). AEDPA provides that a federal court may not grant a § 2254 habeas petition unless the state PCR court's adjudication on the merits of the petitioner's claim resulted in a decision that (1) was "contrary to" clearly established federal law, (2) "involved an unreasonable application of" clearly established federal law or (3) was "based on an unreasonable determination of the facts in light of the evidence" before it. 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011).

In the context of § 2254(d), clearly established federal law means governing legal principles from the Supreme Court at the time of the state PCR court's decision. *See Witherspoon v. Stonebreaker*, 30 F.4th 381, 393 (4th Cir. 2022). The clearly established

14

federal law relevant to this appeal are the principles from the Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court reaffirmed that the Sixth Amendment right to counsel "is the right to the effective assistance of counsel." *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970)). *Strickland* set forth a two-prong test governing ineffective assistance of counsel claims. A petitioner must show that (1) his counsel's performance was deficient and (2) that deficient performance prejudiced the petitioner's defense. *Id.* at 687.

To prove the first prong, the petitioner must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Id.* This "demands a showing that 'counsel's representation fell below an objective standard of reasonableness,' taking into account 'prevailing professional norms' and whether 'the challenged action might be considered sound trial strategy.'" *Witherspoon*, 30 F.4th at 393 (quoting *Strickland*, 466 U.S. at 688–89). "The critical question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Winston v. Pearson*, 683 F.3d 489, 504 (4th Cir. 2012) (internal quotes omitted). A reviewing court's scrutiny of counsel's performance must be "highly deferential, so as to afford counsel latitude in making strategic decisions." *Witherspoon*, 30 F.4th at 393. In fact, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Even "strategic choices made after less than complete investigation are reasonable precisely to

15

the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

To prove the second prong, the petitioner must show "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 693. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test." *Id.* And "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington*, 562 U.S. at 111–12. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 693, 697). Ultimately, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Here, Cox contends that the state PCR court's denial of postconviction relief on his ineffective assistance claim involved an unreasonable application of *Strickland* at the first prong—the only prong the state PCR court reached. For purposes of § 2254(d), "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (emphasis in original). To warrant a writ of habeas corpus, a petitioner must show that the state PCR court's application of *Strickland* was "objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014) (cleaned up). "[E]ven a strong case for relief does not mean the state

16

court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. Rather, a petitioner must demonstrate that the state PCR court's ruling on his ineffective assistance claim "was so lacking in justification" that no "fairminded jurist[ ]" could agree with it. *Id.* at 101, 103. Moreover, "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Id.* at 105 (internal citation and quotes omitted). The federal court must give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

"If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 103. "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (internal quotes omitted).

## III.

Two issues are before us.[4] The first is Cox's argument that the district court erred in denying his § 2254 petition, as the state PCR court unreasonably applied *Strickland* in determining that his trial counsel did not render ineffective assistance by failing to introduce the Central Booking activity logs at trial. The second is the State's argument on cross-appeal that we should vacate the certificate of appealability issued by the district court because it was improvidently granted. We consider these issues in turn, beginning with the State's cross-appeal.

---

[4] We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(c)(1)(A).

17

A.

The district court issued a certificate of appealability on one issue: "whether trial counsel rendered ineffective assistance of counsel by failing to utilize the booking records as part of Mr. Cox's defense at trial." J.A. 477–78. The State argues that the district court improvidently granted this certificate because Cox failed to make a substantial showing of the denial of a constitutional right, as required by § 2253(c)(2). According to the State, Cox failed to demonstrate that reasonable jurists would find the district court's assessment of his ineffective assistance claim debatable or wrong.

As a threshold matter, we must first decide if the State may challenge the issuance of the certificate of appealability. On one hand, while § 2253(c)(1)'s requirement that a petitioner obtain a certificate of appealability is jurisdictional by its plain terms, § 2253(c)(2)'s requirement that the petitioner make a substantial showing of the denial of a constitutional right before a certificate is issued is not. *Gonzalez*, 565 U.S. at 142–43. Rather, § 2253(c)(2)'s condition for *when* a certificate of appealability may issue "screens out issues unworthy of judicial time and attention and ensures that frivolous claims are not assigned to merits panels." *Id.* at 145.

On the other hand, that § 2253(c)(2) is not jurisdictional does not preclude a challenge to the issuance of a certificate of appealability based on a failure to satisfy that provision. Neither does the gatekeeping function of the certificate of appealability process. After all, § 2253(c)(2)'s requirement that a petitioner make a substantial showing of the denial of a constitutional right remains just that—a requirement is still "mandatory," even if not jurisdictional. *Id.* at 146; 28 U.S.C. § 2253(c)(2) ("A certificate of appealability *may*

18

*issue . . . only* if the applicant has made a substantial showing of the denial of a constitutional right." (emphasis added)). What's more, the Supreme Court has told us that "[a] timely objection can[not] be ignored." *Gonzalez*, 565 U.S. at 146. Accordingly, if a party, including the government, "timely raises the [certificate's] failure to indicate a constitutional issue" satisfying § 2253(c)(2), we "must address the defect." *Id.*[5]

That said, the certificate of appealability inquiry "is not coextensive with a merits analysis." *Buck v. Davis*, 580 U.S. 100, 115 (2017). Section 2253(c)(2) only requires a

---

[5] In holding that the government may challenge a certificate of appealability, we join our sister circuits that have held the same. *See United States v. Castro*, 30 F.4th 240, 247 (5th Cir. 2022) ("When we spot a defective [certificate of appealability], on our own initiative or otherwise, it should be vacated."); *Spencer v. United States*, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc) ("[A] certificate of appealability . . . must specify what constitutional issue jurists of reason would find debatable. . . . A failure to specify that issue would violate the text enacted by Congress . . . and will result in the vacatur of the certificate."); *Phelps v. Alameda*, 366 F.3d 722, 728 (9th Cir. 2004) ("[T]he pursuit of efficiency alone does not support an absolute bar against examining the validity of a [certificate of appealability]."); *Khaimov v. Crist*, 297 F.3d 783, 786 (8th Cir. 2002) ("[C]ircumscribing, and even revoking, a certificate [of appealability], especially one we have issued, is . . . well within our authority"); *Ramunno v. United States*, 264 F.3d 723, 725 (7th Cir. 2001) ("Vacating a certificate of appealability is an unusual step, . . . but the possibility of review is essential if the statutory limits are to be implemented"); *Porterfield v. Bell*, 258 F.3d 484, 485 (6th Cir. 2001) ("Under these circumstances, we believe a review of the district court's decision [to grant a certificate of appealability] is appropriate, if only to provide guidance to district courts faced with the task of certifying claims for appeal."). *See also Garrett v. United States*, No. 23-1353, 2023 WL 5524042, at *1 (3d Cir. July 10, 2023) (unpublished) (concluding that district court improvidently granted certificate of appealability); *United States v. Bentley*, 49 F.4th 275, 284 n.6 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 787 (2023) (exercising its "discretion to disregard an improvidently granted certificate of appealability and affirm on the merits for the sake of judicial economy"). *But see Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000) (holding that a certificate of appealability issued by a district court is "presumptively valid and may not be challenged as improvidently granted"); *LaFevers v. Gibson*, 182 F.3d 705, 711 (10th Cir. 1999) (holding that the court of appeals "must review the merits of each claim" following a district court's grant of a certificate of appealability).

19

substantial showing of the denial of a constitutional right. To repeat, this means that a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal quotes omitted). And as the Supreme Court has stated, "a claim can be *debatable* even though every jurist of reason might agree, after . . . the case has received full consideration, that [the] petitioner will not prevail." *Id.* at 338 (emphasis added).[6]

Here, no one disputes that the State timely objected to the certificate in its cross-appeal. Even so, we reject the State's argument that the certificate was improvidently granted. Though the State insists that Cox failed to make a substantial showing of the denial of a constitutional right, the district court thought the Sixth Amendment ineffective assistance issue was a "close call" and was "reluctant to conclude that reasonable jurists

---

[6] Likely for that reason, instances of courts of appeals vacating certificates of appealability are uncommon. Circuit courts that have vacated certificates of appealability as improvidently granted have seemingly done so in limited circumstances. For instance, some circuits have vacated certificates that fail to specify a constitutional issue as required by § 2253(c)(2). *See, e.g.*, *Saunders v. Warden, Holman Corr. Facility*, No. 20-12427-P, 2022 WL 4075519, at *1 (11th Cir. June 28, 2022) (unpublished, per curiam), *cert. denied*, 143 S. Ct. 738 (2023); *Castro*, 30 F.4th at 245; *Phelps*, 366 F.3d at 730. And some have vacated certificates where the merits of the defendants' arguments were so very clearly lacking that granting the certificate was improper. *See, e.g.*, *Garrett*, 2023 WL 5524042, at *1 (overturning grant of certificate of appealability due to untimely § 2255 motion); *Dillard v. Burt*, 194 F. App'x 365, 369–70 (6th Cir. 2006) (finding certificate of appealability improvidently granted on issue of constitutionality of defendant's sentence as habitual offender because record did not show that defendant was sentenced as habitual offender). Alternatively, in one case, a circuit court concluded that "a review of the district court's decision" to grant a certificate of appealability was "appropriate, if only to provide guidance to district courts faced with the task of certifying claims for appeal." *Porterfield*, 258 F.3d at 485.

would not find its assessment of the claim debatable or wrong." J.A. 467. And, as we explain in more detail below, Cox indeed raises meaningful questions about the wisdom of his trial counsel's strategy. He has, therefore, made a substantial showing of the denial of a constitutional right, which is all that § 2253(c)(2) requires. We decline to vacate the certificate as improvidently granted.[7]

B.

Turning to the merits of Cox's appeal, Cox argues that the district court erred in concluding that the state PCR court's denial of his ineffective assistance claim did not involve an unreasonable application of *Strickland*. As noted above, the state PCR court resolved Cox's ineffective assistance claim on the first prong of the *Strickland* test—deficient performance. Emphasizing the reasons Cox's trial counsel offered for her decision to not introduce the activity logs, the state PCR court concluded that she engaged in a valid trial tactic. Cox, however, maintains that trial counsel's decision was not a valid strategy but a choice to "simply cut corners" in her representation. Reply Br. at 5.

"*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." *Harrington*, 562 U.S. at 110 (internal quotes omitted). And we are required to give "considerable deference" to the state PCR court's decision that trial counsel met that

---

[7] The State has alternatively argued that the district court erroneously expanded the scope of the certificate of appealability by sua sponte suggesting in its order that Cox could argue that his trial counsel rendered ineffective assistance by failing to introduce the activity logs at the pretrial hearing on Cox's motion to suppress West's testimony. Given that the plain language of the issue certified for appeal concerns counsel's failure to introduce the activity logs "at trial," J.A. 478, we disagree. In any event, the State conceded at oral argument that this alternative argument is moot, given Cox continues to confine his ineffective assistance claim to the failure to introduce the activity logs to the jury at trial.

bar. *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). As the state PCR court recognized, trial counsel testified that she obtained the activity logs from Central Booking, spoke with the Central Booking records custodian and consulted with Johnson's counsel before deciding not to introduce the activity logs at trial. Worried that the reliability of the activity logs would be undermined by the records custodian or prosecutor, trial counsel chose to challenge West's testimony in other ways. Indeed, she cross-examined West about the open location of the day room phones that he purportedly used to report Johnson and Cox's involvement in the murder to a detective. Trial counsel also cross-examined West about the fact that his phone call would have been recorded. She even confirmed with West that Central Booking officials tracked inmates' movements by scanning their barcoded bracelets. Drawing on this cross-examination, trial counsel's closing argument highlighted the State's failure to introduce any recording of West's phone call, any testimony of the detective he supposedly called or any activity logs showing that Cox and West were together at Central Booking.

Cox makes a compelling argument that trial counsel's decision to not introduce the activity logs was unwise. He points out that, had the logs been introduced, the jury might have believed what the activity logs purported to show—that Cox and West were not in the same area of Central Booking on the morning that West purportedly spoke with Cox and Johnson. And since the State's case against Cox depended on the jury believing that they were in the same room, those activity logs could have devastated the prosecution. And Cox adds that there was little, if any, risk in introducing the activity logs. According to Cox, at worst, the jury would have disregarded them due to their potential inaccuracies.

22

But *Strickland* requires that reviewing courts afford counsel wide latitude to make strategic decisions. Some strategic decisions fare better than others. While introducing the activity logs may have been the most effective way to challenge West's testimony, we cannot say that the state PCR court unreasonably applied *Strickland* in determining that Cox's trial counsel's decision was a valid trial strategy. Trial counsel made a reasonable investigation into the activity logs. She then determined that attempting to prove that Cox and West were not together at Central Booking using records of questionable reliability was too risky. Trial lawyers, quite appropriately, consider the pros and cons of potential pieces of evidence. Perhaps Cox is right that there was little risk in introducing the logs, at least in comparison to their potential benefit. But at the same time, it is difficult to know for sure how a jury might react if the centerpiece of Cox's defense is undermined.

So, trial counsel pursued the same point—that the State could not prove beyond a reasonable doubt that Cox and West were in the same room—in a different way. She decided to challenge West's testimony through cross-examination and her closing argument. And to trial counsel's credit, "[t]o support a defense argument that the prosecution has not proved its case[,] it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Valentino v. Clarke*, 972 F.3d 560, 582 (4th Cir. 2020) (quoting *Harrington*, 562 U.S. at 109). Once again, criticizing trial counsel's strategic decision may be fair. But we must still give it deference under *Strickland*. And her strategic decision followed a thorough investigation into the activity logs, making it "virtually unchallengeable." *See Strickland*, 466 U.S. at 690.

23

Still, Cox emphasizes that the district court recognized a potential inconsistency between the state PCR court's conclusion that his trial counsel's performance was not deficient and its "finding" that the activity logs "clearly show" that Cox and West were never in the same room at Central Booking. *See* J.A. 467. But, in the habeas context, we "should avoid finding internal inconsistencies and contradictions in the decisions of state courts where they do not necessarily exist." *Kelley v. Bohrer*, 93 F.4th 749, 755 (4th Cir. 2024) (quoting *Ferguson v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 1315, 1340 (11th Cir. 2013)). Even Cox acknowledged at oral argument that, despite the district court's characterization of the state PCR court's order, it is not clear that the state PCR court really made such a finding. The state PCR court used that language in a paragraph summarizing Cox's argument, suggesting that the state PCR court may have merely been recounting Cox's view that the activity logs clearly show he was never in the same room as West.[8] And even if the state PCR court made a finding that the activity logs "clearly show" that Cox and West were not together at Central Booking, that finding is not necessarily inconsistent with its conclusion that trial counsel did not render deficient performance. Taken at face value, the activity logs did clearly purport that Cox and West were not together in the same room at Central Booking. But trial counsel decided not to introduce the logs because she worried the jury would not take the records at face value upon learning

---

[8] In a paragraph summarizing Cox's argument, the state PCR court stated, "Although the records clearly shows [sic] that Petitioner and West were never in the same room, Petitioner asserts that trial counsel's decision not to admit the evidence and leave West's testimony regarding face-to-face conversation with Petitioner and co-defendant Johnson unchallenged constitutes ineffective assistance of counsel." J.A. 176.

24

of their potential unreliability. And as we have determined, there is a reasonable argument that her decision was a valid strategy.

Since we must "doubly" defer to trial counsel and the state PCR court, we cannot conclude that the state PCR court's denial of Cox's ineffective assistance claim "was so lacking in justification" that no "fairminded jurist[ ]" could agree with it. *See Harrington*, 562 U.S. at 101, 103. Because the state PCR court's application of *Strickland* was not "objectively unreasonable," *see White*, 572 U.S. at 419, we must affirm the district court's denial of Cox's § 2254 petition.[9]

IV.

For these reasons, we affirm the district court's denial of Cox's § 2254 petition.

*AFFIRMED*

---

[9] AEDPA's sizeable hurdles for federal court habeas relief do not preclude executive review if a plausible case of actual innocence is made. *See In re Stevens*, 956 F.3d 229, 233–34 (4th Cir. 2020) ("By limiting the power of the federal courts, AEDPA shifts the focus to those actors who possess the ultimate discretion to prosecute, pardon, and preserve convictions.").